# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-2092

THEODORE W. OSWALD,

*Petitioner-Appellee*,

v.

DANIEL BERTRAND,

*Respondent-Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01-C-0182—**Lynn Adelman**, *Judge*.

_____

ARGUED NOVEMBER 3, 2003—DECIDED JUNE 29, 2004

_____


Before POSNER, DIANE P. WOOD, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*. Oswald, a Wisconsin state prisoner, sought federal habeas corpus after exhausting his state remedies in *State v. Oswald*, 606 N.W.2d 207 (Wis. App. 1999), review denied, 609 N.W.2d 473 (Wis. 2000). The district court found that the state court of appeals had been unreasonable in ruling that the judge who presided at Oswald's criminal trial had conducted a constitutionally adequate inquiry into possible jury bias. 249 F. Supp. 2d 1078 (E.D. Wis. 2003). The state appeals.

   Ordinarily it would be clear that the issue for the district court and us would be whether in turning down Oswald's claim of constitutional error the state courts had made "an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). But this is only if the prisoner's claim was adjudicated by the state court "on the merits." § 2254(d). If not, the special deference to a state court's determinations that is prescribed by section 2254(d)(1) goes by the board. *Braun v. Powell*, 227 F.3d 908, 916-17 (7th Cir. 2000); *Moore v. Parke*, 148 F.3d 705, 708 (7th Cir. 1998); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003). The state appellate court discussed and disposed of Oswald's claim that the jury selection procedure used in his case had denied him an impartial tribunal, but it did not discuss the claim with reference to federal law. No matter. So long as the standard it applied was as demanding as the federal standard, *Mitchell v. Esparza*, 124 S. Ct. 7, 10 (2003) (per curiam); *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Reid v. True*, 349 F.3d 788, 799-800 (4th Cir. 2003); *Sellan v. Kuhlman*, 261 F.3d 303, 311-14 (2d Cir. 2001)—and there is no suggestion that it was not, cf. *Hammill v. State*, 278 N.W.2d 821, 822 (Wis. 1979)—the federal claim is deemed adjudicated on the merits and its rejection therefore entitled in this habeas corpus proceeding to the deference prescribed by section 2254(d)(1).

   The nature of Oswald's claim has now to be explained. The due process clause of the Fourteenth Amendment entitles a state criminal defendant to an impartial jury, *Morgan v. Illinois*, 504 U.S. 719, 726 (1992), which is to say a jury that determines guilt on the basis of the judge's instructions and the evidence introduced at trial, as distinct from preconceptions or other extraneous sources of decision. *Patton v. Yount*, 467 U.S. 1025, 1037 n. 12 (1984); *Irvin v. Dowd*, 366 U.S. 717, 721-23 (1961); *United States v.*

*McClinton*, 135 F.3d 1178, 1185-86 (7th Cir. 1998); *United States v. Angiulo*, 897 F.2d 1169, 1182-83 (1st Cir. 1990). In addition—and this is critical—the clause requires the trial judge, if he becomes aware of a possible source of bias, to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial." *Remmer v. United States*, 347 U.S. 227, 230 (1954); see also *United States v. Thomas*, 463 F.2d 1061, 1063-64 (7th Cir. 1972); *United States v. Humphrey*, 208 F.3d 1190, 1198-99 (10th Cir. 2000); *United States v. Davis*, 177 F.3d 552, 556-57 (6th Cir. 1999); *Howard v. Moore*, 131 F.3d 399, 422 (4th Cir. 1997) (en banc). In *Smith v. Phillips*, 455 U.S. 209, 217 (1982), the Supreme Court put the two points together, saying that "due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." The Court also made clear in *Smith* that while *Remmer* had been a federal prosecution, the duty of inquiry is equally engaged when a defendant is tried in a state court. 455 U.S. at 215, 218; see also *Whitehead v. Cowan*, 263 F.3d 708, 724-26 (7th Cir. 2001); *Evans v. Young*, 854 F.2d 1081, 1083-84 (7th Cir. 1988); *United States v. Bradshaw*, 281 F.3d 278, 289-93 (1st Cir. 2002); *Howard v. Moore, supra*, 131 F.3d at 422.

In 1994, Oswald, who was then 18 years old, robbed a bank with his father. Fleeing toward Waukesha by car, they were stopped by two policemen. The two Oswalds, both armed with semi-automatic rifles, shot at the officers, killing one, and continued their flight, in the course of which they took a woman hostage and forced her to drive them in her van. At a police roadblock there was another shootout; the hostage and two officers were wounded, the hostage escaped, and the Oswalds took off in the van; eventually it crashed and they were arrested. The second shootout, the hostage's escape, and the crash of the getaway car were all

videotaped, and broadcast throughout the Waukesha area. As the district judge explained, "the case generated an enormous amount of publicity both in the immediate aftermath of the crime and during the period leading up to the trials of the Oswalds. The serious nature of the offenses, the fact that a local police officer was killed, the existence of the videotape (with its echoes of the O. J. Simpson case) and the fact that the defendants were father and son combined to make the case probably the most notorious in the history of Waukesha County." The widow of the police officer who had been killed initiated a highly publicized petition for reinstatement of the death penalty in Wisconsin. Hundreds of T-shirts and sweatshirts were sold, many to police and prison guards, depicting the crashed van, bearing the legend "Oswald's final mistake was coming to the Town of Pewaukee," and calling for the reinstatement of the death penalty in Wisconsin.

Oswald (the son, the petitioner in our case) was tried separately from his father nine and a half months after their crime spree and was convicted and given the redundant sentence of 565 years in prison consecutive to two life sentences. His father was tried separately and received a comparable sentence. Because of the avalanche of pretrial publicity, Oswald could doubtless have obtained a change of venue had he moved for it, but he did not. His only defense against the criminal charges was that his father had coerced or brainwashed him into participating in the robbery and subsequent mayhem, and, again in the words of the district judge, Oswald's lawyer thought that "because some of the publicity had portrayed him as a victim of his abusive and manipulative father, a local jury might be more receptive to his defense than a jury elsewhere" in Wisconsin.

The court sent jury questionnaires to 156 residents of Waukesha County, more than 80 percent of whom responded that on the basis of the media coverage of the

crime they thought that Oswald was guilty. Fifty of the 156 were voir dired, and of those 50, 29 were picked to be the jury pool. Since under Wisconsin law each side would have seven peremptory challenges (the usual number for crimes punishable by life in prison is six, but since the judge decided to seat three alternates he gave each side one more peremptory challenge, Wis. Stat. Ann. §§ 972.03, .04(1)), if all 14 were used there would still be 15 jurors—12 regulars and the three alternates. Hence the cut to 29.

It took four days to winnow the list down first from 156 to 50 and then from 50 to 29, and during this period the prospective jurors spent all day in a room in the courthouse from which the bailiff would lead them out one by one to be questioned in the courtroom. On the last day, one of the prospects, Roger Klitzka, in the course of being voir dired, said, "I know I've learned more in the last three days here sitting down there in that room about this case than I have since the day that it happened . . . . [A]ccording to what I hear, the young man is guilty of what he is being accused of and things like that and everything and I just think it's just a waste of time." The judge asked him whether he meant "it's a waste to have the trial at all," and Klitzka confirmed that that was indeed what he meant.

Apparently this was not just Klitzka's personal opinion (he was not selected for the jury). The implication of what he said was that the entire jury pool had made up its mind that Oswald was guilty. We will never know for sure, however, what he meant. Rightly fearing that the prospective jurors had been conducting marathon bull sessions on Oswald's guilt, Oswald's lawyer asked Klitzka to explain what he had heard in these sessions. Klitzka refused to answer, and at the prosecutor's urging the judge refused to direct him to answer. Oswald's lawyer requested the judge to ask the other prospective jurors what had been discussed

in the jury room. The prosecutor (who made every possible effort to prevent the judge's determining whether jurors were biased) objected, saying it was "crazy" to think that the jurors had not discussed the case when they had been sitting "for 4 days in a crowded jury room downstairs" in "a case that everybody other than one juror that we have talked about has seen a videotape concerning probably the highest profiled case in this county in 20 years and not to even think or mention the case or mention how disgusted they are with the process." Apparently the "process" that the prosecutor thought must have disgusted the prospective jurors was the voir dire itself, for he mentioned a prospective juror being "interrogated" and feeling as if "she's on trial."

Even though the circumstances strongly suggested that the jury had made up its mind that Oswald was guilty, the judge refused either to question Klitzka further or to recall for further questioning any of the prospective jurors who had already been voir dired. He did permit Oswald's lawyer to inquire about the discussions in the jury room from the three members of the pool who had not yet been voir dired. The first of the three confirmed that the jurors had been discussing the case; the other two denied having heard other jurors express an opinion—which, of course, doesn't mean that other jurors had not expressed an opinion; those two might not have been listening.

That afternoon the judge, who must by this time have been worried about whether the impartiality of the prospective jurors had been compromised, asked one of the bailiffs responsible for shepherding the jurors what he had overheard in the jury room. The bailiff said he hadn't heard the jurors talking about the case, but added that he had been in the jury room only intermittently. And the jurors might have been hesitant to discuss the case—having been instructed not to—in the presence of a court official.

During the lunch recess that day the judge had gone to the jury room and reminded the prospective jurors not to discuss the case. On that occasion one of the prospective jurors, William Schuenke, had told the judge: "I really want to talk to you. I had written that letter. It's really important. I don't want to—I'm part of the 29" (who had survived the first stage of the voir dire). In his letter Schuenke had written: "I will more than likely be so concerned about my work that I'd not give in trial all the attention it should receive to the point that I might just vote either way just to end it." Oswald's lawyer, who had seen the letter, wanted to question Schuenke further. The judge refused, though aware that Schuenke's remark to him in the jury room had been heard by the other prospective jurors. The judge knew this because he'd been at the front of the room and Schuenke at the back, with the other jurors in between, yet the judge had heard him, so the jurors must have as well. The judge had received notes from three other jurors as well saying they didn't want to serve on the jury. An oral request was relayed to him by a fourth.

When the 29 prospective jurors who had survived the first cut returned to the courtroom, Schuenke had another outburst, saying to the judge in the hearing of the rest of the jury pool, "I asked to speak to you 2 days ago. You mean I can't get five minutes of your time?" The judge told him his request had been addressed, but he replied, "Not to me they weren't you know." Schuenke served on the jury because the defense used up all its seven peremptory challenges on other prospective jurors whom the judge had refused to excuse for cause.

The trial lasted three weeks. The jury, after deliberating for three hours (according to press reports—the information isn't in the record), returned a verdict of guilty on all 19 counts in the indictment.

The circumstances that we have narrated demonstrate a high probability that some, maybe all, of the jurors who tried Oswald were biased. It is not just what Klitzka said or what Schuenke said; those were merely the most dramatic indications that, as the judge obviously realized, the process of jury selection was being poisoned. The question is whether, given the indications of jury bias, the judge's inquiry was adequate. From the case law we distill the principle that adequacy is a function of the probability of bias; the greater that probability, the more searching the inquiry needed to make reasonably sure that an unbiased jury is impaneled. *United States v. Davis*, 15 F.3d 1393, 1412-13 (7th Cir. 1994); *Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003); *United States v. Bradshaw*, 281 F.3d 278, 289-90 (1st Cir. 2002); *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993). The response to the jury questionnaires against the background of enormous publicity concerning the most sensational criminal episode in the county's history, the fact that Oswald seemed so obviously guilty as to make the necessity for a trial questionable to a layperson, the tumult induced by Schuenke's vocal complaints, the flagrant disobedience of the judge's instructions that the prospective jurors not discuss the case in advance of the trial, the likelihood that Schuenke and perhaps other reluctant jurors would vote to convict regardless of their actual views if that would make the trial end quicker, the fact that, at least according to Klitzka, the improper discussions had already produced a consensus that Oswald was guilty as charged— *all* these things, taken not separately but together, created a sufficiently high probability of jury bias to require on the part of the trial judge a diligent inquiry.

The inquiry he conducted did not satisfy that standard. Reminding the jurors not to discuss the case *after* they had been discussing it for four days was a case of closing the barn door after the horse had escaped. Questioning one of

the bailiffs (and why just one?) was not likely to elicit much useful information about the mood and mindset of the prospective jurors. Allowing Oswald's lawyer to question just three of the prospective jurors about conversations in the jury room was arbitrary, especially since by cutting off the questioning of Klitzka the judge had made clear that he wouldn't permit follow-up questions. The bobtailed inquiry that the judge conducted flunked the constitutional test that "the investigation be reasonably calculated to resolve the doubts raised about the juror's impartiality." *Dyer v. Calderon*, 151 F.3d 970, 974-75 (9th Cir. 1998) (en banc); see also *Mu'Min v. Virginia*, 500 U.S. 415, 419-22, 430-32 (1991); *United States v. Beckner*, 69 F.3d 1290, 1291-94 (5th Cir. 1995); *United States v. Boylan*, 898 F.2d 230, 257-59 (1st Cir. 1990); cf. *Turner v. Murray*, 476 U.S. 28, 35-36 (1986) (plurality); *Ham v. South Carolina*, 409 U.S. 524, 525-27 (1973). To repeat, the greater the doubts, the more probing the inquiry that is required.

It is true that by refusing to move for a change of venue, the defense lawyer may have been trying to game the system. Wisconsin law forbade the judge to order a change of venue on his own or the prosecutor's motion. Wis. Const. art. 1, § 7; Wis. Stat. §§ 971.19(1), 971.22; *State v. Bangert*, 389 N.W.2d 12, 34-35 (Wis. 1986); *State v. Mendoza*, 258 N.W.2d 260, 266-69 (Wis. 1977). Oswald's best hope may have been that the trial might founder on inability to impanel an impartial jury in the county in which the crime had been committed. It is difficult to see how Oswald could prevail with his Patty Hearst or *Manchurian Candidate* defense. Defenses such as self-defense, public and private necessity, and coercion are not intended for cases in which a person kills an innocent to save his own hide, as when the shipwrecked defendants in the famous case of *Regina v. Dudley & Stevens*, 14 Q.B.D. 273 (1884), ate the cabin boy rather than starve, and were convicted of murder. See also *United States v.*

*Buchanan*, 529 F.2d 1148, 1153 (7th Cir. 1975); *United States v. LaFleur*, 971 F.2d 200, 204-06 (9th Cir. 1991); *Henry v. State*, 586 So. 2d 1033, 1036 n. 6 (Fla. 1991) (per curiam), vacated on other grounds, 505 U.S. 1216, on remand, 613 So. 2d 429 (Fla. 1992); *Amin v. State*, 811 P.2d 255, 260 (Wyo. 1991); *United States v. Holmes*, 26 Fed. Cas. 360, 366-68 (C.C.E.D. Pa. 1842) (No. 15,383); *State v. Cooper*, 993 P.2d 745, 748 (N.M. App. 1999); *State v. Soine*, 348 N.W.2d 824, 826 (Minn. App. 1984); *State v. Banks*, 539 P.2d 173, 175 (Ariz. App. 1975); 2 Wayne R. LaFave, *Substantive Criminal Law* §§ 9.7, 10.1(c), 10.4(g), pp. 72, 123-24, 157-58 and n. 82 (2d ed. 2003). Wisconsin law permits a murderer to plead coercion as a complete defense, provided he didn't commit first-degree murder, Wis. Stat. Ann. § 939.46(1)—and for reasons unknown Oswald was not charged with first-degree murder though he was tried for conspiracy to commit intentional homicide. But there is an exception to the right to plead coercion if the coercion was by the defendant's coconspirator, *id.*, which is the only possibility here. In fact Oswald's theory is that he was brainwashed by his father into committing the crimes. That is why we mentioned *The Manchurian Candidate*, the movie based on a novel by Richard Condon in which Laurence Harvey is brainwashed by the Chinese Communists into becoming an assassin narrowly prevented from killing a Presidential candidate by Frank Sinatra.

If brainwashing is just a form, a particular instantiation, of the defense of coercion, it is barred by the conspirator exception; if brainwashing is a separate defense, it probably is not recognized by the law, see Joshua Dressler, "Professor Delgado's 'Brainwashing' Defense: Courting a Determinist Legal System," 63 *Minn. L. Rev.* 335 (1979); and if it is merely an effort to show that Oswald was somehow incapable of forming an intent to kill, it would be highly unlikely to persuade a jury. It is less surprising that the jury

rejected Oswald's defense than that it was submitted to the jury in the first place. The reason for the judge's doing so, as far as we can determine, is that Oswald denied that he had conspired with his father—again something that it is difficult to imagine a jury accepting.

But even if Oswald is certain to be convicted if he is retried, this cannot justify our reversing the grant of his petition for habeas corpus. Even a clearly guilty criminal is entitled to be tried before an impartial tribunal, something the jurors in this case may well have failed to understand. *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991); *Irvin v. Dowd, supra*, 366 U.S. at 722; *Tumey v. Ohio*, 273 U.S. 510, 535 (1927); *United States v. Spears*, 558 F.2d 1296, 1297 (7th Cir. 1977); *Coleman v. Kemp*, 778 F.2d 1487, 1540-41 (11th Cir. 1985); *United States v. Essex*, 734 F.2d 832, 845-46 (D.C. Cir. 1984); *State v. Baumruk*, 85 S.W.3d 644, 650-51 (Mo. 2002). It is one of the handful of rights of a criminal defendant that is not subject to the doctrine of harmless error. For others see *Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986) (plurality) (racial discrimination in the selection of the grand jury); *Waller v. Georgia*, 467 U.S. 39, 49-50 and n. 9 (1984) (right to a public trial); *McKaskle v. Wiggins*, 465 U.S. 168, 177 n. 8 (1984) (right to self-representation); *Gideon v. Wainwright*, 372 U.S. 335, 343-45 (1963) (right to counsel).

We explained the thinking behind these exceptions to the rule that harmless errors do not vitiate criminal convictions in *Walberg v. Israel*, 766 F.2d 1071, 1074 (7th Cir. 1985): "If the police, after arresting Walberg and obtaining an eye-witness identification of him plus his confession, had taken him directly to the penitentiary on the ground that a trial would be a waste of time for someone so patently guilty, he would be entitled to release on habeas corpus; he would have been deprived of his liberty without due process of law. The Constitution requires (unless the defendant

waives his rights) a certain modicum of adversary proce-
dure even if the outcome is a foregone conclusion because
the evidence of guilt is overwhelming." Oswald was entitled
to be tried by a jury that undertook to decide his guilt on the
basis of the evidence rather than of what they had learned
from the pretrial publicity about the case and analyzed over
a four-day period while waiting for the trial to begin. It was
natural that having seen the videotape of Oswald's crimes,
laypersons would assume his guilt was open and shut. But
a jury that decides guilt before the trial begins is little better
than a lynch mob.

The state appellate court's condonation of the lack of a
minimally timely, minimally adequate, investigation was an
unreasonable application of *Remmer v. United States* and
*Smith v. Phillips* and is therefore subject to correction in this
habeas corpus proceeding. It is not as if the state appellate
court had given reasons for its decision that, even if we did
not find them persuasive, we could not pronounce unrea-
sonable. A state court can of course be wrong without being
unreasonable, and the reasonableness of a decision ordi-
narily cannot be assessed without considering the quality of
the court's reasoning, cf. *Middleton v. McNeil*, 124 S. Ct. 1830,
1832-33 (2004) (per curiam); *Price v. Vincent*, 538 U.S. 634,
641-43 (2003); *Woodford v. Visciotti*, 537 U.S. 19, 24-27 (2002)
(per curiam), though the ultimate question, as we empha-
sized in *Hennon v. Cooper*, 109 F.3d 330, 334-35 (7th Cir.
1997), is not whether the state court gets a bad grade for the
quality of its analysis but, as the statute says, whether the
decision is an unreasonable application of federal law as
stated by the U.S. Supreme Court to the facts.

The appellate court's discussion of the jury selection issue,
like the trial court's investigation, was perfunctory. It is true
that the discussion takes up a number of pages in the

appellate court's opinion. But most of them address two issues that are peripheral to the question of the adequacy of the trial court's investigation. The first is the accuracy of the testimony of one prospective juror about the discussions in the jury room, a witness whom the district court found credible though the state courts had not. The second is whether Schuenke had lied in answering a question put to him in the voir dire. We assume without having to decide that the state courts resolved these issues correctly; neither the testimony of the prospective juror in question, nor Scheunke's alleged lie, figured in our narrative of the process by which the jury was selected. The appellate court did say, in addition, that Oswald failed to prove that Scheunke was prejudiced against him, and this may be true; but Oswald was not given a chance to prove it—the inquiry into Scheunke's prejudice was too truncated. As far as the narrative of the jury selection process is concerned, the accuracy of which is not in question, the state appellate court said *nothing* beyond the naked conclusion that the judge had done enough. It mentioned Klitzka's answers, but did not address their bearing on the issue of jury prejudice. The state does not argue that Oswald failed to present his constitutional claim in his state appeal, and so the sparseness of the state appellate court's analysis cannot be excused on that ground.

The fact that Oswald had a chance to present evidence at a postconviction hearing does not alter our conclusion that he was denied due process of law. The single sentence in its opening brief that the state devoted to the adequacy of that hearing is inadequate to preserve the issue in this court; it has been waived. In any event we don't think the postconviction hearing would dissolve Oswald's constitutional claim even if the issue had been preserved. When the issue of jury bias does not arise until after trial and conviction, the trial judge cannot be faulted for having failed to

investigate it, and a postconviction hearing is an inevitable and authorized substitute. *Rushen v. Spain*, 464 U.S. 114, 119 (1983) (per curiam); *Smith v. Phillips, supra*, 455 U.S. at 215-18; *id.* at 221-24 (concurring opinion); *Owen v. Duckworth*, 727 F.2d 643, 646 (7th Cir. 1984) (per curiam); *Fitzgerald v. Greene*, 150 F.3d 357, 364-65 (4th Cir. 1998); cf. *United States v. Bishawi*, 272 F.3d 458, 462-63 (7th Cir. 2001). But as *Dyer v. Calderon*, from which we quoted earlier, makes clear, if the issue does surface during, or in this case before, trial, it is the *trial* judge's responsibility to conduct an adequate investigation, given the unsatisfactory character of an inquiry into jury bias after the trial is over and the defendant convicted. Compare *United States v. Bradshaw, supra*, 281 F.3d at 289-93; *United States v. Angiulo, supra*, 897 F.2d at 1183-86. Having invested time in the trial and voted to convict the defendant, jurors are unlikely to acknowledge bias, or even to remember the particulars of the discussions that they had had of the case before it was tried—their recollections are likely to be overshadowed by what they learned about the case during the trial. That is why cases such as *Bradshaw* and *Angiulo* stress the importance of a prompt determination, by the trial judge, at the jury-selection stage. Obviously if the problem arises or is discovered later, it must be dealt with later; that is all that cases like *Rushen* allow.

The order of the district court that Oswald be either retried or released is therefore

AFFIRMED.

EVANS, *Circuit Judge*, dissenting.  The majority, in bolstering its decision, draws on an example we mentioned in *Walberg v. Israel*, 766 F.2d 1071 (7th Cir. 1985), observing that if police have an airtight case they nevertheless cannot take an obviously guilty defendant "directly to the penitentiary on the ground that a trial would be a waste of time for someone so patently guilty." But is this what happened

here? No. Is this even remotely close to what happened here? No, again. Fifty prospective jurors were questioned over 4 days; the state trial judge granted 21 out of 27 of Oswald's challenges for cause of potential jurors; the jury heard from numerous witnesses and examined many exhibits during the 3 weeks it took to complete the trial. Yet today, the court orders new tickets to this old show for reasons that, in my view, cannot support such a drastic step.

I agree with the majority's announcement that AEDPA requires us to grant deference, under 28 U.S.C. § 2254(d)(1), to the 1999 decision of the Wisconsin Court of Appeals rejecting Oswald's direct state appeal. *State v. Oswald*, 606 N.W.2d 207. But after making that determination, the majority proceeds first to offer its independent view of the facts involving the jury selection process. It then concludes that the Wisconsin Court of Appeals' "condonation of the lack of a minimally timely, minimally adequate, investigation was an unreasonable application of *Remmer v. United States* and *Smith v. Phillips*, and is therefore subject to correction in this habeas corpus proceeding." Why is the Wisconsin court's conclusion unreasonable? The answer seems to be that the majority considers the state court's discussion of the issue to be "perfunctory." This is where the majority loses me. Giving the Wisconsin Court of Appeals' decision the deference to which it is due under AEDPA, I cannot agree that it was either perfunctory or unreasonable. I would not order a do-over of Oswald's trial.

The majority takes the drastic step of ordering a retrial because it detects problems in the jury selection process based on statements made by two potential jurors. First, it is troubled by the statement of prospective juror Roger Klitzka during voir dire. Klitzka, however, never made it into the jury box for the trial. And his statement that potential jurors were "discussing the case" (whatever that means—it could cover things like how long the trial will

take and whether or not the jury would be locked up) found no support, as the majority notes, from two of the three potential jurors who were subsequently asked about it. More importantly, his statement about waiting room conversations does not, in my view, cast doubt on the willingness of the jurors actually selected for service to give Oswald a fair shake on his defense.

Second, the majority is concerned about juror William Schuenke who, like a lot of people summoned for what will be lengthy jury service, preferred to be elsewhere. He said he was "concerned about my work" and might not be able to give the "trial all the attention it should receive . . . ." Schuenke never said he rejected out-of-hand Oswald's potential defense of coercion. He was asked, "Do you feel like you have an open mind with respect to any possible defenses that I might offer for my client?" His answer was "Yeah." The follow-up question was, "I guess that's all I'm trying to find out is whether based on what you've read or heard you feel that there's something you wouldn't listen to or wouldn't even consider if it was evidence in the case?" The answer: "No."

From the minor problems with Klitzka and Schuenke, mere snippets of events over a 4-day period, the majority jumps to the unfounded conclusion that there is "a high probability that some, maybe all, of the jurors who tried Oswald were biased." On this flimsy foundation, the majority strains to build a case for requiring a retrial.

From what the majority says, one might conclude that the Wisconsin Court of Appeals brushed off the issue involving juror bias with a paragraph or two. The fact is that the court spent 18 pages on jury issues. I would be the last person to say the length equals quality, but length certainly seems to indicate a lack of perfunctoriness. Unlike my colleagues, the

Wisconsin court discussed in some detail the postconviction hearing on Oswald's motion for a new trial, which included the jury issue.

The Wisconsin Court of Appeals set the matter in context, noting that this was an unusual case "not only because of the enormous media coverage of the charged criminal activities, but also because of defense counsel's plan to turn the media coverage into a positive factor for his client." The media consistently portrayed Oswald as an "impressionable teenager who was victimized by his abusive and manipulating father." The defense strategy, the court said, was that jurors who had heard and seen the extensive media coverage might be sympathetic to him. Given the facts of this case, I can't disagree with Oswald's lawyer's belief that sympathy, although at best a Hail Mary defense, was probably his client's best chance for any sort of success.

Oswald's focus during the jury selection process was not on whether the prospective jurors thought that he was "involved," to use the carefully chosen words of Juror Schuenke, or "guilty," meaning much the same as "involved" to lay jurors. In fact, a videotape showing much of the drama was going to be presented as evidence at trial. Oswald was not going to claim that he was sitting in the bleachers at Wrigley Field at the time of the shoot-out. He was not going to argue that a twin brother, not he, was "involved." Rather, he was planning to minimize his role by placing responsibility for the crimes on his father. He was looking for jurors who would be open-minded to his defense that his father made him do it. For instance, a juror was asked whether her feelings would prevent her "from considering a defense of coercion if the Judge instructed [her] to consider it?" Whether that strategy would work is not an issue for us, yet I certainly agree with the majority's observation that any such "Manchurian Candidate" defense would be "highly unlikely to persuade a jury."

Given Oswald's trial strategy, the decision not to request a change of venue becomes explicable. One juror, no doubt, gave the defense hope that the strategy might possibly work. During voir dire, she said that she and her husband were "talking about the possible defense and the fact that, you know, the father having abused or having mentally abused . . . ." If the media coverage had, in fact, been a positive factor for Oswald, it would have been a strong one; nearly all of the 156 prospective jurors who received questionnaires had even seen a television videotape of the shoot-out.

Given that Oswald's strategic choice was to keep this very high-profile trial in Waukesha County, it would have been absurd for him to think he could find jurors who could truthfully say they had not seen the videotape showing him in the van during the shoot-out. It would also be absurd to think that it would be possible to find honest potential jurors who, based on their viewing of the tape, did not think that Oswald was "guilty" *in the sense that laypersons use the term "guilty.* On this issue, the reasoning of the Wisconsin Court of Appeals bears repeating:

> In his brief, Oswald claims that all the prospective jurors expressed strong opinions that he was guilty. These opinions, he argues, go "straight to the heart of the issue: their ability to presume the defendant inno- cent unless proven guilty of the charges." However, the facts and circumstances of this case reveal that this statement is incorrect. For Oswald, the heart of the issue during voir dire was securing a jury amendable to his coercion defense strategy. As a part of this strategy, Oswald was opting not to contest his participation in the crimes. His tactical decision was not to protest his guilt. This strategy involved searching for a particular type of juror; this ideal juror would not presume that

Oswald was innocent but would be influenced by the media coverage and also could be supportive of a coercion defense. The particular type of juror that Oswald sought is an important circumstance surrounding the voir dire.

In addition, prospective juror after prospective juror was asked whether he or she could "set aside whatever it is that you may have already heard or seen that you know is out there someplace, could you set aside that and deal only with what is presented during the trial?" The answers varied from a forthright "yes" to more thoughtful answers indicating that the juror would try or would hope that he could. Reading the transcript, one senses the struggle that the prospective jurors were going through in their attempt, at least in many cases, to give honest answers. To now look at the cold record and say that they knew too much should not be sanctioned by this court.

As to specific alleged juror misconduct, the defense was given a full opportunity to explore the issue at a post-conviction hearing. But all that was offered in the way of evidence was the testimony of one prospective juror (Jacqueline M.) who was stricken from the panel. The trial court found that she was not credible for several reasons, including the fact that she had given several false answers on her juror questionnaire. The Wisconsin Court of Appeals discussed the testimony at some length and set out the reasons for the finding that it was incredible. It then upheld the trial court's conclusion that a new trial was not warranted. Even if some judges on this court disagree with that conclusion, it seems to me that it is hard to say it is "unreasonable" under AEDPA. After all, "compelling institutional considerations" require that we afford deference to the trial court as it has the primary responsibility to evaluate possible influence on the jury. *Arizona v. Washington*, 434

U.S. 497 (1978). The state trial court, backed up by the Wisconsin Court of Appeals, did not make an unreasonable call.

Supreme Court cases make clear that, even before AEDPA, a state court's findings are entitled to deference. In *Patton v. Yount*, 467 U.S. 1025 (1984), during voir dire, a juror and two alternates expressed that they would have required evidence to overcome their beliefs that the defendant was guilty. The trial judge asked if they could set aside that opinion and accepted their answers that they could. The Court applied the presumption of correctness to the trial court's resolution of the issue. Interestingly enough, the Court also noted that potential jurors are people who are unused to being questioned by lawyers in court and "cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially." At 1039. In this case, federal appellate judges sitting in Chicago should be slow to condemn the factual determinations of a state circuit judge in Waukesha County, Wisconsin—a judge who presided over a lengthy 4-day jury selection process in a high profile, high publicity case kept in the county as a result of a strategic defense decision not to try and have it moved.

*Smith v. Phillips*, 455 U.S. 209 (1982), involved a juror who had applied to be an investigator in the prosecutor's office, a fact the prosecuting attorneys found out during trial but withheld from the court. A hearing was held after trial, and the judge found no evidence suggesting a sinister motive on the part of the juror, which would have disqualified him. When the case came to federal court, the district court granted the petition for a writ of habeas corpus and the

Court of Appeals affirmed (but on different grounds). The Supreme Court found the hearing held by the state trial court to be sufficient:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

At 217.

I do not minimize the duty of the trial judge to be vigilant to juror misconduct. I do, however, believe that we must pay more than lip service to the commands of AEDPA. The Supreme Court has rather clearly said that alleged juror misconduct and the response of the trial judge cannot be evaluated in a vacuum. We need to be mindful of the context in which the trial judge is operating and to keep our eyes on the facts which are at issue. This trial judge was not asleep at the wheel, and the Wisconsin Court of Appeals was not so cavalier as the majority would have us believe. As far as I can see, the panel of jurors that heard this case—especially given the fact that young Oswald never contested his physical participation in this insane crime spree—was not poisoned. My colleagues' conclusion to the contrary is regrettable. I respectfully dissent.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*