In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 08-3511, 08-3549, 08-3885 & 08-4144

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRIS BLITCH, MICHAEL HARRIS,
DEVARL WASHINGTON, and
MICHAEL CARWELL,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 00586—**Elaine E. Bucklo,** *Judge.*

ARGUED NOVEMBER 5, 2009—DECIDED SEPTEMBER 3, 2010

Before BAUER, MANION, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Chris Blitch, Michael Harris,
Devarl Washington, and Michael Carwell were tried
and convicted of conspiring to distribute 15 kilo-
grams of cocaine. During the trial, several events took
place that a district judge might never see during the
course of a judicial career. First, after the initial jury

heard testimony from the government's principal witness, jurors expressed concern for their safety because the defendants had access to information about them. The judge declared a mistrial after individual questioning of the jurors revealed the jurors could not remain fair. A new jury pool was summoned and provided written questionnaires, but the new panel expressed the same concern before jury selection had been completed. This time, the judge did not conduct individual voir dire, and the jury was sworn and impaneled. Finally, at the end of the trial, when the jurors indicated they had reached a unanimous verdict, one stated during the polling in open court that the published verdict did not represent her own decision.

These situations did not make for an easy case. Nonetheless, the court's failure to individually voir dire the second panel regarding its safety concerns, and her instructions to keep deliberating after the jury poll, when the jury had specifically requested to leave for the day, lead us to the conclusion that the defendants should receive a new trial. Therefore, we vacate the judgment of the district court and remand for a new trial.

## I. BACKGROUND

This case has its origins in Jamison Moore's guilty plea in Kane County, Illinois state court. Moore had been charged with unlawful delivery of a controlled substance and faced up to thirty years in prison. Facing that length of time in custody, Moore accepted a plea offer from the Kane County State's Attorney's Office that allowed him to plead guilty and receive a probation-only sen-

tence. The no-jail offer did have conditions, of course. In addition to the typical requirement of truthful cooperation, the probation-only offer here required Moore to:

> perform whatever functions or assistance required by Aurora Police Department and the Kane County State's Attorney's Office which results in the arrest and charging of *TEN different individuals with Delivery or Possession with intent to deliver controlled substances or cannabis. Each case must involve a class X amount of cannabis or controlled substance by weight.* The Defendant will not be a transactional witness in any of the cases that are ultimately charged as felony drug offenses, <u>unless</u> specifically authorized.

(Emphases in original). In return, the plea agreement provided that Moore would receive credit for time served and that his sentence would be 48 months' probation.

With Moore's cooperation, the government concocted a story. Special Agent David Gomez of the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") assumed the role of a disgruntled drug courier named "Loquito" who wanted to rob a drug stash house of about 15 kilograms of cocaine. Loquito told his story to Blitch, Carwell, Harris, and Washington and met with them to discuss the robbery of the stash house. In reality, there was no upcoming delivery, no stash house, and no cartel to rob, as the defendants were to find out.

On the chosen day, the defendants showed up at a designated location, some with guns, masks, and gloves.

Harris and Blitch refused to get into a van with Loquito and Moore and instead drove their own vehicle to a storage facility, where Loquito had said the plan was to eventually store the drugs. Carwell and Washington were arrested on the storage facility premises. Harris and Blitch, who declined to follow the van past the storage facility's gate, were arrested outside the gate. The four were charged in federal court with conspiring to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846; attempting to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846; possessing firearms during and in relation to drug trafficking crimes, in violation of 18 U.S.C. § 924(c); and being felons in possession of firearms, in violation of 18 U.S.C. § 922(g)(1).

On Monday, July 23, 2007, the district court assembled fifty jurors and commenced voir dire. The court questioned prospective jurors orally and asked each their name, occupation, and neighborhood of residence, as well as questions on topics including the ages and occupation of their children and past experience with the criminal justice system. The jurors and alternates were selected, and the parties gave their opening statements that afternoon.

The jurors heard testimony from Agent Gomez the next day. At the end of the day, the court informed the parties that when the Court Security Officer (CSO) had been in the jury room earlier in the afternoon, several jurors had expressed concern for their safety in front of all the other jurors and wanted to know whether the

defendants would know where they lived. The judge told the parties that this information bothered her in "two ways, that obviously they were discussing the case in violation of my order not to, at least in that sense, and whether they have prejudged it. I think that we are probably going to have to bring each one of them individually in in the morning and talk to them and decide whether I need a new jury." The judge also told the parties that the jury coordinator "promises me she can get 50 people that were not here on Monday, so they would be 50 new prospective jurors."

The next morning, the CSO recounted for the court and parties what had transpired the previous day. He stated that the jurors had summoned him to the jury room on the premise that they wanted to discuss the heating in the courtroom, but that when he arrived the jurors instead told him they were worried about their families and themselves. The CSO explained that the jurors then asked him a series of questions as to what would be done to protect them from "retaliation," and he asked the jurors to put their concerns in writing for the judge.

In light of this information, the judge summoned individual jurors to the courtroom, one at a time. She questioned each as to what had been said during the discussion regarding jury safety and inquired whether anything said would affect the juror's ability to be fair and impartial. After questioning the first four jurors, the judge expressed concern about whether two could remain fair. She then continued to individually question

the remaining jurors. After she finished, the judge con-
cluded that the jurors' responses did not assure her that
they could render a fair verdict and declared a mistrial.
The judge then brought all the jurors into the courtroom,
thanked them for their service, and informed them they
would be excused. She also assured them she had never
heard of any instances of retaliation against jurors.

The judge decided to use a jury questionnaire for the
next venire, which began the morning after the mistrial.
Prospective jurors completed a twenty-eight-item ques-
tionnaire that began by asking for full name and age,
followed by a request for the cities or suburbs or parts
of Chicago where the prospective juror had lived in the
last ten years. The questionnaire also requested the
name of the current employer, spouse's occupation and
name of employer, and ages of any children, and it
asked additional questions related to experiences as a
victim of crime, with the court, and as a witness. The
judge also asked oral follow-up questions in court.

When voir dire had been completed, the judge
excused the jurors so that she could discuss the final
composition of the jury with the parties. One prospec-
tive juror remained in the courtroom with the CSO, and
the CSO informed the court that the prospective juror
wanted to know why the defendants had copies of the
jury questionnaires. The judge responded that counsel
had the questionnaires, and the prospective juror left the
room. The judge excused that prospective juror from
service on the jury.

The court and parties then began discussing which
other persons should be excused for cause. After a recess,

the court informed the parties, "We are having problems again. We just excused [one prospective juror] because she was saying that she was concerned about it. But she must have been talking to somebody named Deborah Cohen who has now expressed the same thing, that the defendants have their questionnaires. So I'm going to excuse her [Cohen] for cause." The court also stated to the parties that she had given out the questionnaires for the attorneys' use.

After a little more discussion, the judge informed the parties: "Apparently [the CSO] thinks that this is a widespread problem, that they all saw it and they all were talking about it." The judge suggested she could bring all the prospective jurors back into the courtroom to ask whether any felt uncomfortable sitting on the jury. When the prosecutor asked how widespread the situation was, the judge responded that the CSO "thinks that they were all discussing it." As the judge and counsel discussed how to proceed, a defense attorney remarked that they were in the same situation as they had been with the first group of jurors, and even the prosecutor stated, "I just don't see how you can do it without just bringing in everyone individually."

Nonetheless, the judge indicated she favored bringing in the entire venire at once, where she would state that there had never been a problem with juror safety and then ask whether any person had a problem serving on the jury. The defense reiterated its position that this venire had expressed the same concerns as the previous venire had and that a new jury pool should be assembled

the upcoming Monday. The judge responded that was not possible because if she did that, the trial might not finish before she was scheduled to sit by designation on the Federal Circuit.

With the entire venire assembled back in the courtroom, the judge said:

> Okay. Have we got everybody? Okay. This will just take a minute, I think.
>
> I realized a little bit ago there was a prospective juror who, one, was discussing this case outside, and we weren't sure who all she was discussing it with, and, of course, that should not have happened. I just said you can't discuss the case, and it's improper.
>
> But anyway, this person apparently had indicated that for some reason she had an issue about juror safety or something because, of course, defense counsel and the government and everybody needs to go over the qualifications of everybody.
>
> So in the first place, I want to tell you that never in the entire history of the United States as far as I know, and I certainly, I'm quite sure of it, has there ever been, ever been an issue about juror safety. But I want this, you know, I want to know that the people who will decide this case and every case, you know, are deciding it with respect to the evidence that they hear and they aren't thinking about anything else.

> So if there is anybody here who somehow thinks that they have an issue about it, I want you to stay behind while everybody else leaves and I'll talk to you.

One person stayed behind and said he had also noticed that the defendants had the jurors' information. The judge excused that juror from service but not anyone else, and the judge also confiscated notes that a spectator had taken during voir dire.

The case then proceeded to trial. Although the defense subpoenaed Moore, he did not appear at trial, and the jurors did not hear about his plea agreement. (The judge issued an arrest warrant for Moore when he failed to appear. The warrant, however, was not served upon him, and the judge concluded during post-trial proceedings that the government had not taken sufficient steps to locate Moore. The judge nonetheless found that Moore's absence did not prejudice the defense.)

The jurors began deliberating on a Thursday afternoon. At 3:20 p.m. the next day, the court discussed a jury question with the parties and counsel, and the judge indicated her intention to answer the question by referring the jury to its previous instructions. She also told the parties that the jury "had sent an earlier note that I didn't see any need to call you about just saying they'd like to leave at 3:30 this afternoon, and I told them they could." While the court was still discussing the question with the parties, the jury sent another note that it had reached a verdict. The court assembled the jurors in the courtroom, and the foreperson informed the court that the jury had reached a

unanimous verdict. The court read the verdict, which pronounced the defendants guilty on all counts, and polled the jurors at the defendants' request.

During the poll, the second juror answered that the verdict did not represent her individual verdict. The court responded by telling the jury, without conferring first with counsel:

> All right. Then I'm going to ask that you people go back to the jury room. At one point you had indicated you wanted to leave today, but I'll let you people decide what you want to do and deliberate further. We do not have a unanimous verdict, so that is all.

The jurors returned to the jury room. They soon sent out a new note that said: "We have a debated situation with a decision on two of the counts. One, Count 2; two, Count 3. May we have a little direction if possible? What options do we have. Can a juror be asked to be dismissed in a proceedings?"

The court and counsel discussed how to respond, and the court decided to say, "Please continue to deliberate. A juror may not be dismissed." A defense attorney expressed the view that the jurors might take the direction to continue to deliberate to mean that they needed to stay later, and the judge responded that they had already been told they could go home at 3:30 that day. The jury returned with a verdict that found the defendants guilty on all counts.

The defendants each received a sentence of twenty-five years' imprisonment. We note that the large quantity of

drugs—15 kilograms—involved in the fictitious plot in this case helped drive the twenty-five-year sentences each defendant received. *See* U.S.S.G. § 2D1.1 (setting base offense level at 34 when quantity of cocaine is at least 15 kilograms but less than 50 kilograms). And we have commented before that were we policymakers, we might question whether concocting a scheme involving a fictitious stash house represents the proper use of law enforcement resources. *United States v. Corson*, 579 F.3d 804, 806 (7th Cir. 2009). That said, we turn to the defendants' arguments on appeal.

## II.  ANALYSIS

The defendants urge us to grant them a new trial on several grounds. The jury did not hear about Moore's plea agreement or the incentive he had to garner the defendants' arrests, and the defendants argue that the jury should have heard this information. However, we express no opinion on the propriety of this and several other arguments. Fundamental to our system of criminal justice is the right to be tried by an impartial jury that is free from coercion, and we focus on the defendants' contention that issues relating to the jury necessitate a new trial.

### A.   Jury Bias

The Sixth Amendment of the United States Constitution guarantees the bedrock principle of trial by an impartial jury. *Skilling v. United States*, 130 S. Ct. 2896, 2912-13

(2010); *see also Murphy v. Florida*, 421 U.S. 794, 799 (1975) ("The constitutional standard of fairness requires that a defendant have 'a panel of impartial, 'indifferent' jurors.'") (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). This guarantee means "a jury that determines guilt on the basis of the judge's instructions and the evidence introduced at trial, as distinct from preconceptions or other extraneous sources of decision." *Oswald v. Bertrand*, 374 F.3d 475, 477 (7th Cir. 2004).

The defendants contend that they were denied their right to an impartial jury by the district court's refusal to empanel a new venire or, they say, to investigate bias properly after it became known that the prospective jurors were discussing their safety fears in light of the defendants' access to their personal information including their names, occupations, and ages and occupations of their children. As a general rule, we leave matters relating to jury selection to the sound discretion of the trial judge. *Skilling*, 130 S. Ct. at 2917-18; *United States v. Vasquez-Ruiz*, 502 F.3d 700, 704 (7th Cir. 2007). But that discretion is not unfettered, *see Vasquez-Ruiz*, 502 F.3d at 704, and affording a defendant due process requires not only "a jury capable and willing to decide the case solely on the evidence before it," but also "a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

The appropriate procedure when potential juror bias presents itself "is a function of the probability of bias; the

greater that probability, the more searching the inquiry needed to make reasonably sure that an unbiased jury is impaneled." *Oswald*, 374 F.3d at 480. That even one juror's "peace of mind" was affected can be enough to deprive a defendant of a fair trial. *See United States v. Simtob*, 485 F.3d 1058, 1064 (9th Cir. 2007) (vacating conviction and remanding for further proceedings in light of court's failure to investigate potential juror prejudice after a juror informed the court that he felt threatened by the defendant's "eye-balling" him); *see also United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000) ("[T]he seating of any juror who should have been dismissed for cause . . . require[s] reversal."). And in this case it was not just one juror who had expressed concern that the defendants had access to the questionnaires; the judge's understanding was "that they all saw it and they all were talking about it." This is not a case, then, of speculation about whether jury members might have feared for their safety. They did here. This is also not a case of speculation about whether jury members might have been discussing any fears they held. They did that here as well.

In light of the revelation that the whole venire had been exposed to the discussions of fear for personal safety, the defendants were concerned that they would not receive a fair trial from persons who might have prejudged the case or were motivated by fear or preconception. They immediately requested a new pool or, at the least, individual questioning of the prospective jurors. They received neither. It is certainly true that not all allegations of juror bias or misconduct require indi-

vidualized voir dire. *Vasquez-Ruiz*, 502 F.3d at 706; *see also United States v. Stafford*, 136 F.3d 1109, 1112-13 (7th Cir. 1998). We also recognize that "courts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias during the course of a trial . . . . [A]ny such investigation is intrusive and may create prejudice by exaggerating the importance and impact of what may have been an insignificant incident." *United States v. Abrams*, 137 F.3d 704, 708 (2d Cir. 1998).

Nonetheless, we find the procedure in this case insufficient under the circumstances. The first important circumstance is, as we have already emphasized, the widespread nature of the discussions among the jurors. Unlike cases where a judge decides against individual voir dire of the entire panel at the risk of conjuring up new fears among previously unexposed jurors, individual questioning here did not run the same risk of planting a new concern in anyone's mind since all the venire members were part of the discussion. *Cf. United States v. McAnderson*, 914 F.2d 934, 943-44 (7th Cir. 1990) (affirming decision not to individually question remaining jurors about fear or bias after judge removed jurors who had received or heard about threatening phone calls). In addition, although it was understood that the discussions of safety concerns were widespread, no juror was asked what had been said in the internal discussions. *Cf. Vasquez-Ruiz*, 502 F.3d at 707 (failure to question individual jurors "left a void in the record").

Notably, the identical situation had already arisen with the first panel of jurors, and the judge and

prosecutor agreed then that an individual inquiry of each juror was needed. After questioning only four of the jurors in the first trial, the effect was already so obvious that the judge stated, "I doubt we'll need to go through [all] 12 [jurors]." The court ultimately granted a mistrial in the first trial, with no objection from the government, and it stated at one point "so many of them were involved in the discussion that I'm not sure we are going to be able to solve this."

When the same issue arose with the second group of jurors, however, the court did not individually question the jurors. That was despite the defense's objection, and also despite the government's recognition that each juror should be questioned one at a time, with the prosecutor stating, "I just don't see how you can do it without bringing in every one individually. . . ." It is hard to see a difference between the first and second trials that counseled against individual questioning in the second. In the first trial, the issue arose after two days of trial had already been held. The petit jury had been selected, the parties had presented opening statements, the government had presented its direct examination of its principal witness, Agent Gomez, and the defendants were into the third cross-examination of the agent. But a jury had not even been selected when the issue arose in the second trial. The fact that the issue arose so early in the second trial would seem to make it an easier decision to start over than in the first trial. As the district court said when declaring a mistrial in the first trial, "If this was two weeks into the trial, it would be a little tougher call."

The only discernable difference in the record as to why the same procedure of questioning each juror individually was not followed in the second trial is that the judge planned to sit by designation on another court the following Tuesday and that any delay in jury selection might have interfered with that schedule. When the second venire's safety concerns were revealed, defense counsel requested a new jury pool, and the following colloquy transpired between the court and defense counsel:

> COUNSEL: Judge, the way I would weigh in on this is we are in the exact situation we were in the last time.

> JUDGE: I am not going to take every one of these 55 people again.

> COUNSEL: I understand that, but they've expressed the same concern that the last venire expressed.

> JUDGE: I don't even know why. I don't understand it.

> COUNSEL: And because of that, I think they've already expressed some kind of deep seated—

> JUDGE: Okay. If you have something to add, or are you disagreeing with what I proposed before I forget it?

> COUNSEL: My position is that we should let these people go, we should come back Monday and try it again.

JUDGE:      Well, we won't be able to do that be-
            cause we might not finish before
            I have to sit on the Federal Circuit.

COUNSEL:    Then I think, I don't think my client
            can get a fair trial. I just don't think
            he can, because I think they've al-
            ready expressed—

JUDGE:      Now you're just making speeches
            now at this point. Bring the jurors in.

When the identical issue arose with the first group of jurors, the government argued for an individualized inquiry. It did the second time too. Although district judges have discretion in deciding how to handle instances of potential juror bias, that discretion must be based on proper factors. *See Verizon Commc'ns, Inc. v. Inverizon Int'l*, 295 F.3d 870, 872-73 (8th Cir. 2002) (an abuse of discretion occurs when an irrelevant or improper factor is considered and given significant weight); *United States v. Robertson*, 45 F.3d 1423, 1438-39 (10th Cir. 1995). It appears from the record that scheduling concerns were the basis for the decision not to conduct individual voir dire the second time the issue arose. *Cf. United States v. Thornton*, 1 F.3d 149, 155-56 (3d Cir. 1993) (affirming decision not to question jurors individually when trial judge weighed the potential emphasis that came from questioning jurors against the probable extent and gravity of the misconduct and concluded that individual voir dire would make the situation worse).

We are mindful of the discretion district judges have when determining whether a jury is biased and of the deference we pay to a district judge's determination that a jury can remain impartial. As the Supreme Court said recently, "Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Skilling*, 130 S. Ct. at 2918. Here, however, those same considerations are not in play, as the judge did not individually question the jurors at issue. We also understand the concern that a defendant could affirmatively make jurors fearful and then try to benefit from a more focused inquiry, but there is no suggestion in this case that it was the defendants' conduct that made the jurors uncomfortable. *Cf. United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005). And we do not say that individualized voir dire is necessarily required every time a jury expresses concern that defendants have access to information about them. Under the circumstances of this particular case, however, we find the inquiry inadequate. This is not to suggest that the judge should have cancelled her commitment to sit by designation, a practice we fully support. Here, though, we cannot discern any basis from the record why this short trial could not have been rescheduled to another date. No speedy trial concerns were raised, it was the defendants who requested a new panel of jurors, and they expressed no scheduling conflicts. In

fact, we do not see any indication in the record that the court or counsel were unavailable soon after the judge returned from sitting by designation.[1]

The government argues that even if the inquiry was unsatisfactory, the defendants should not receive a new trial because it maintains they were not prejudiced. We note that in doing so, it treats the jurors' safety concerns as an external influence. *Compare Simtob,* 485 F.3d at 1064, *with, e.g., United States v. Lopez*, 271 F.3d 472, 489 (3d Cir. 2001). The defendants, pointing to cases including *Oswald,* 374 F.3d at 482, contend that the right to be tried before an impartial jury is structural such that they need not show prejudice and are not subject to harmless error review. While we note that even under the government's position, it would have the burden to rebut the presumption of prejudice from an external influence, *see Vasquez-Ruiz*, 502 F.3d at 705, we need not resolve the issue as the defendants point to another source of error as well. *See United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001) ("Cumulative errors, while individually harmless, when taken together can

---

[1] It is not our place to suggest the best method for addressing jurors' safety concerns, if that is a recurring problem, as that is a matter for the district court to address. That the issue arose twice in this case may well have been a fluke. We also note that although the jury coordinator informed the judge that she would assemble fifty new persons for the second venire, it is possible that a member of the first jury spoke with a member of the second venire and expressed the first jury's concerns.

prejudice a defendant as much as a single reversible error and violate a defendant's right to due process of law."). We turn there now.

### B.   Instruction to Continue the Deliberations

After the court read a verdict that stated the defendants had been found guilty on all counts, a poll of the jurors revealed that the published verdict did not represent the individual verdict of each of the jurors. The defendants contend that subsequent directions the jury received to continue deliberating, at and after the time that the jury had already requested and received permission to leave for the weekend, were coercive and necessitate a new trial.

"The principle that jurors may not be coerced into surrendering views conscientiously held is so clear as to require no elaboration." *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam). Our assessment of whether instructions to the jury were impermissibly coercive looks to "'whether the court's communications pressured the jur[ors] to surrender their honest opinions for the mere purpose of returning a verdict.'" *United States v. Crotteau*, 218 F.3d 826, 835 (7th Cir. 2000) (quoting *United States v. Kramer*, 955 F.2d 479, 489 (7th Cir. 1992)). Even though a judge might have the best of intentions, innocently intended directions can still be coercive. *United States v. Chaney*, 559 F.2d 1094, 1098 (7th Cir. 1977). In *Chaney*, for example, the judge gave a supplemental instruction to the jurors at 12:20 a.m. that said, "If you do not arrive at a verdict then the jury will be brought

into the court tomorrow morning at 9:30 and the Court will then determine what course should be taken." We ruled that the jurors could have understood the direction to mean that they must reach a verdict to avoid being required to stay until 9:30 a.m., or that they must deliberate until reaching a verdict, or that the court might require them to continue deliberating in the morning even though they had been without sleep. In light of these potential inferences, we concluded that the instruction, although innocently given, required a new trial. *Id.*

In this case, the jurors began deliberating on a Thursday afternoon and began again the next morning. Sometime on Friday, the jurors sent a note that requested permission to leave that day by 3:30 p.m., and the judge responded that they could. At about 3:20 p.m., the jury sent a note with a question about the requirements for conviction on one of the charges. While the judge and parties were discussing how to respond to the question, the jury sent another note that said it had reached a verdict.

The court brought the jurors into the courtroom. After announcing a verdict that convicted the defendants on all counts, the court polled the jurors at the defendants' request, and the second juror polled responded that the published verdict did not represent her individual verdict. The defendants contend on appeal that at this point, the judge should have given the instruction we approved in *United States v. Silvern*, 484 F.2d 879, 883 (7th Cir. 1973), which provides:

> The verdict must represent the considered judgment of each juror. In order to return a verdict, it

is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. You are not partisans. You are judges—judges of the facts.

Your sole interest is to ascertain the truth from the evidence in the case.

During discussions with the trial judge, however, defense counsel stated it did not think a *Silvern* instruction was a good idea then, so our review of the request for a *Silvern* instruction is for plain error. *See United States v. Jones*, 600 F.3d 847, 856 (7th Cir. 2010).

The jury must be deadlocked before a *Silvern* instruction is required. *See United States v. Degraffenried*, 339 F.3d 576, 580 (7th Cir. 2003); *United States v. Miller*, 159 F.3d 1106, 1101-11 (7th Cir. 1998). The juror's response during the poll that the verdict as published did not reflect her own verdict meant there was not a unanimous verdict, but it did not necessarily mean the jury was

deadlocked. *See United States v. Carraway*, 108 F.3d 745, 752 (7th Cir. 1997) (per curiam). As we explained in *Carraway*, "[W]hen the court decided . . . to have the jury continue deliberating—after polling of the jury had been interrupted by the juror's announcement that she disagreed with the guilty verdict against Carraway—there was no clear indication that the jury was deadlocked as to Carraway's culpability and that further deliberations would be fruitless. The jury had, after all, signed a unanimous verdict as to Carraway, and the reason for the objecting juror's second thoughts were (and are) unknown." *Id*. The same reasoning holds true here. We do not know why the juror responded that the published verdict did not represent her individual verdict, and, more importantly, there was no indication that further deliberations would not be helpful. There was no plain error when the jury did not receive a *Silvern* instruction at that juncture.

The lack of a *Silvern* instruction at this point (and note that the jury had received the *Silvern* instruction as one of its instructions before it began deliberating), therefore, was not a problem in and of itself. The direction to continue deliberating after the poll revealed a lack of unanimity also was not inherently problematic, *see Carraway*, 108 F.3d at 752, as reflected in Rule 31(d) of the Federal Rules of Criminal Procedure:

> After a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually. If the poll reveals a lack of unanimity, the court

may direct the jury to deliberate further or may
declare a mistrial and discharge the jury.

However, our review does not end there, as the defen-
dants also contend that the court's communications after
the poll were coercive of unanimity. This argument
requires that we consider the directions given by the
trial court in "'context and under all the circumstances.'"
*Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988) (quoting
*Jenkins*, 380 U.S. at 446). Although Rule 31(d) allows a
judge to direct the jury to deliberate further if a poll
reveals a lack of unanimity, it does not allow, of course,
for directions that are coercive. And although we find
no plain error in the fact that the jurors did not receive
a *Silvern* instruction after the poll, the policy behind
the *Silvern* instruction matters: a juror should not "sur-
render his honest conviction as to the weight or effect
of evidence solely because of the opinion of his fellow
jurors, or for the mere purpose of returning a verdict."
*Silvern*, 484 F.2d at 883 n.5.

The jurors had asked earlier in the day to leave by
3:30 p.m. and been told they could. Nonetheless, when
the jury returned a verdict very close to that time and
the second juror polled answered that the published
verdict did not represent her own, the court followed
that juror's response by stating:

> All right. Then I'm going to ask that you people
> go back to the jury room. At one point you had
> indicated you wanted to leave today, but I'll let
> you people decide what you want to do and delib-
> erate further. We do not have a unanimous
> verdict, so that is all.

This directive to continue deliberating was issued right around 3:30 p.m., the time that the jury had already asked for and received permission to leave. It came without the caveat that if the jurors still wanted to leave at 3:30 p.m. that day, they could do so by simply telling the judge. *Cf. United States v. Talkington*, 875 F.2d 591, 596-97 (7th Cir. 1989) (direction not coercive that asked jurors whether they wished to (1) continue deliberating for another hour, or (2) go either home or to a hotel for the evening and continue deliberating the next morning at 10:00 a.m.). It also came without consulting counsel; hearing from the parties outside the jury's presence might have yielded a response to the jury upon which all could agree. *Cf. Talkington*, 875 F.2d at 597.

On their face, the directions the jurors received after the poll suggested that the jurors could not leave for the day until they had a unanimous verdict, despite their previous request to have already left by that point. Perhaps the statement, "At one point you had indicated you wanted to leave today, but I'll let you people decide what you want to do and deliberate further," had been intended as an invitation for the jurors to leave for the day if they wished in light of their earlier request to depart at 3:30 p.m. Unfortunately, it reads as the opposite, especially since it was preceded by a direction to return to the jury room and followed by the statement, "We do not have a unanimous verdict, so that is all."

At the time of that direction, apparently only a single vote stood between the defendants and conviction, and

care was especially important. The jurors soon sent out another note confirming their disagreement: "We have a debated situation with a decision on two of the counts. They are as follows: One, Count 2; two, Count 3. May we have a little direction if that is possible? Can a juror be asked to be dismissed in a proceedings?" The court discussed the note with counsel and indicated it would answer with the direction, "Please continue to deliberate. A juror may not be dismissed." One defense counsel responded with concern that the jurors might take such a direction to mean they could not leave as early as they wanted and stated, " 'Please continue to deliberate.' Maybe that means they'll think they have to stay tonight. I mean, maybe—" The court responded, "Well, they have already been told they can go home." To that, defense counsel responded with the ambiguous, "Okay," which could well be an acknowledgment that the court had ruled against it. The bottom line is that the jurors were again told without caveat to continue deliberating, despite their request earlier in the day to leave by 3:30 p.m.

We do not know why jurors had asked to leave that day by 3:30 p.m., or whether the holdout juror needed or wanted to leave by that time on that particular day. What we do know is that the jurors may well have understood the post-poll instructions to mean that they needed to return a unanimous verdict immediately if they still wanted to leave at their requested time. Even though the effect was unintentional, under these circumstances, we conclude that the instructions were impermissibly coercive. These directions, along with the inadequacy of the inquiry into the jurors' safety

concerns, lead us to conclude that the defendants should receive a new trial.

### III. CONCLUSION

The judgment of the district court is VACATED, and the defendants will receive a new trial. Circuit Rule 36 shall apply.