*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0227p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

CLEVELAND R. JACKSON,
　　　　　　　*Petitioner-Appellant,*

　　　*v.*

MARC C. HOUK, Warden,
　　　　　　　*Respondent-Appellee.*

No. 08-3677

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 07-00400—Donald C. Nugent, District Judge.

Argued: April 20, 2011

Decided and Filed:  July 24, 2012

Before:  MERRITT, MARTIN, and ROGERS, Circuit Judges

———————————

**COUNSEL**

**ARGUED:** James A. Jenkins, Cleveland, Ohio, for Appellant.  Thomas E. Madden, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** James A. Jenkins, John B. Gibbons, Cleveland, Ohio, for Appellant. Thomas E. Madden, Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

———————————

**OPINION**

———————————

MERRITT, Circuit Judge.  Cleveland R. Jackson was convicted by an Ohio jury of two murders committed in 2002.  The court sentenced him to two separate death sentences, one for each murder.  The Supreme Court of Ohio on direct appeal reversed and vacated the death sentence for one of the murders based on the trial judge's errors in limiting the *voir dire*, but it affirmed the other death sentence.  Jackson later filed a federal habeas corpus petition, claiming a number of grounds of relief, all of which the

1

district court denied. We granted a certificate of appealability as to nine of those claims, the most difficult of which concerns the claim that the trial court violated Jackson's right to due process of law when, after denying his counsel the right to question the jury concerning pretrial publicity, it then denied his motion for a change of venue premised on the extraordinary pretrial publicity present in Lima, Ohio, the small community in which he was tried. Based on Supreme Court precedent, we are required to affirm.

## I. Factual and Procedural History

On the evening of January 3, 2002, Petitioner Jackson and his half-brother, Jeronique Cunningham, went to the apartment of Shane Liles in Lima, Ohio, to rob him of money and drugs. Liles had sold Cunningham crack cocaine earlier that day. Shortly after the two arrived, Liles and Jackson discussed a drug transaction on the apartment's staircase while, nearby, Cunningham sat in the living room and watched television with three teenagers who happened to be in the apartment. One of those teenagers was Leneshia Williams.

The robbery was set into motion when Cunningham stood up and ordered the three teenagers into the kitchen. It quickly turned violent when Cunningham produced a gun and struck one of the teenagers in the jaw with it after he did not immediately comply with Cunningham's order. Jackson then brandished a gun of his own, aimed it at Liles, and forced him upstairs where he robbed him of money and drugs. Jackson then tied Liles's hands behind his back and took him downstairs to the kitchen, where Cunningham was holding captive the original three teenagers and four other individuals, including one three-year-old girl named Jayla Grant.[1] Jackson ordered Liles to give him the rest of the money. When Liles responded that he had given Jackson all that he had, Jackson shot him in the back.

Jackson and Cunningham then opened fire on everyone in the kitchen. After shooting until both of their guns were emptied of ammunition, the two men fled the

---

[1] In the record, Jayla Grant's first name is spelled "Jala." However, we will follow the district court and spell her name "Jayla."

scene. Though all in the kitchen were shot at least once, two were killed: Leneshia Williams and Jayla Grant.

Jackson was indicted for both murders and for aggravated robbery and attempted aggravated murder as to the surviving shooting victims. In a trial completed immediately prior to Jackson's trial, Cunningham was also charged with, convicted of, and sentenced to death for the same two murders. His habeas appeal is separately pending before this court. The murder counts each contained two death-penalty specifications, one alleging that the murder was committed as part of a course of conduct to kill or attempt to kill two or more persons, and one alleging that the murder was committed during an aggravated robbery and with prior calculation and design. At trial, Jackson denied committing the murders. He took the stand in his own defense, appeared to attribute the robbery principally to Cunningham, and denied all of the shootings save for that of Liles, which, Jackson maintained, only occurred when his gun accidentally went off. Jackson claimed that Cunningham's gun also malfunctioned after Cunningham attempted to shoot one of the others in the kitchen, that Cunningham then took Jackson's gun, and that Jackson heard one shot as he ran out of the apartment. He claimed to find out only later that others had been shot, though he also conceded meeting with Cunningham shortly thereafter and fleeing the scene in a car together. Unpersuaded by this account, the jury convicted Jackson of all counts and specifications, and, after a penalty-phase hearing, imposed a sentence of death for each murder count. The court followed the jury's verdict and separately sentenced Jackson to death for each murder.

The preceding factual account is drawn from Jackson's direct appeal to the Supreme Court of Ohio. *State v. Jackson*, 836 N.E.2d 1173, 1183-85 (Ohio 2005). That court rejected all of Jackson's claims of error as to his guilt, but accepted one claim of error challenging one of his two death sentences: as to the murder count pertaining to three-year-old Jayla Grant, the court determined that the trial court abused its discretion in handling the jury *voir dire* by denying Jackson's request to inform potential jury members — some of whom had expressed tendencies toward automatic imposition of the death penalty for child killers — that one of the victims was a young child. *Id*. at

1187-92. It found that this error did not affect the validity of the other death sentence. *Id.* at 1192. Though it remanded the Grant count for resentencing, the result of the direct appeal was that Jackson's death sentence, if only for the murder of Leneshia Williams, became final.

After unsuccessfully pursuing post-conviction relief in the Ohio state courts, Jackson filed a petition for a writ of habeas corpus in federal district court, pursuant to 28 U.S.C. § 2254. His petition raised twenty claims. The district court denied them all and declined to grant a certificate of appealability on any of them. *Jackson v. Houk*, No. 3:07CV0400, 2008 WL 1946790 (N.D. Ohio May 1, 2008).

We then certified nine of Jackson's habeas claims for appellate review: (1) the trial court improperly limited Jackson's ability to uncover juror bias against him in connection with pretrial publicity which led it to deny his motion for a change of venue; (2) the trial court improperly prohibited trial counsel from examining prospective jurors about potential bias against someone accused of killing a young child; (3) the trial court improperly prohibited trial counsel from conducting a careful and searching examination of prospective jurors about potential bias against someone accused of killing a young child; (4) the trial court improperly prohibited trial counsel from examining prospective jurors about whether they could consider a life sentence for the killing of a young child; (5) the trial court improperly prohibited trial counsel from examining prospective jurors who expressed reservations about imposing the death penalty; (6) the trial court improperly excused prospective jurors who expressed reservations about imposing the death penalty; (7) the cumulative effect of the trial court's errors in *voir dire* amounted to a denial of a fundamentally fair trial; (8) trial counsel rendered ineffective assistance of counsel throughout trial; and (9) trial counsel rendered ineffective assistance of counsel by failing to investigate and introduce helpful and explanatory mitigating evidence at trial. We will address each in turn, beginning with Jackson's venue claim.

One final point, before turning to the merits of these claims. Jackson filed his habeas petition subsequent to the effective date of the Antiterrorism and Effective Death

Penalty Act (AEDPA). This fact significantly constrains our review of most of Jackson's claims. Where a claim was not overlooked but was adjudicated on the merits in a state court proceeding, we may grant the writ only if the state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In the recent case of *Greene v. Fisher*, 565 U.S. ____, 132 S. Ct. 38, 43-44 (2011), a unanimous Supreme Court observed that the AEDPA standard "is difficult to meet, because the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." (internal quotation marks and citations omitted.)

## II. The Denial of Jackson's Motion for a Change of Venue

We address first Jackson's claim that the trial court constitutionally erred when it denied his motion for a change of venue premised on the extensive pretrial publicity surrounding the murders, while at the same time denying him the right to question the jury about any specific details concerning a juror's knowledge of the publicity. Jackson presented this claim on direct appeal, but the Supreme Court of Ohio did not address it at all. Because de novo review leads to affirmance, we need not decide whether AEDPA deference applies under the rule of *Harrington v. Richter*, 131 S. Ct. at 784-85. Accordingly, we review it de novo. We take into account the unusually detailed and extensive publicity about the murders in this case, and about the trial and death sentence of Cunningham immediately before Jackson's trial. We also take into account for purposes of due process the limitations placed on defense counsel during *voir dire*, and the small size of the community in which these events took place. We are governed by the strict principles limiting federal review of jury *voir dires* and motions for change of venue imposed by the Supreme Court in *Mu'Min v. Virginia*, 500 U.S. 415 (1991) and *Skilling v. United States*, 130 S. Ct. 2896 (2010). Constrained by the language of these two Supreme Court opinions, we conclude that no due process violation occurred.

### A. Factual Background

We turn first to the details of the pretrial publicity that surrounded this case. Newspapers and television in the community of Lima, Ohio, consistently identified Jackson and his accomplice, Cunningham, as the sole suspects in the case from the moment of their apprehension some three days after the murders. [J.A. 7470.] Nearly every step of the legal proceedings against them was chronicled, beginning with their first appearance in court, which the *Lima News* covered with photographs of the two men in bullet proof vests and an article relating that "[e]xtra officers were brought in for added security due to the publicity surrounding the crime" and quoting a victim's family member as saying, "I can't wait to see what they're going to get." [J.A. 7473-74.] Two days later, a newspaper account mentioned that security problems caused by "the high running emotions surrounding the case" were forcing court and state officials to avoid preliminary hearings. [J.A. 7477.] Accounts spoke of a "mountain of evidence, including two lengthy statements" from both defendants. [J.A. 7483.] The pretrial motions in Jackson's case — including the venue motion at the heart of the present appeal — received considerable media attention. [J.A. 7485-91.] Newspaper accounts even covered the litigation surrounding the contents of proposed jury questionnaires to be used in selecting Jackson's jury. [J.A. 7492.]

Meanwhile, the pre-trial rulings and trial of Cunningham, which occurred just prior to that of Jackson, were covered in detail by the press. [*See*, *e.g.*, J.A. 7493-7522.] Opening arguments in the Cunningham trial were described under the headline "'New Year's Massacre' on Eureka Street." [J.A. 7513.] Media accounts relayed the testimony of James Grant, the father of the child victim, in which he described "begg[ing] for his young daughter's life as a gun was pointed at her head and fired." [J.A. 7509.] Later accounts repeating this scene further dramatized the testimony in Cunningham's trial: "[T]he remaining soon-to-be victims huddled together on the kitchen floor, crying as James Grant pleaded with the men to spare the life of his 3-year-old daughter, [Jayla] Grant. But the men didn't listen." [J.A. 7515.] Television accounts described testimony in Cunningham's trial specifically accusing Jackson of shooting Jayla Grant.

[J.A. 7586.] As soon as the verdict came in, local television stations broke into daytime programming such as *The Oprah Winfrey Show* in order to report that Cunningham had been found guilty. [J.A. 7796.] A news account summarizing the jury's death verdict against Cunningham quotes an assistant prosecutor as promising of Jackson's trial: "It's going to be a rewind and play it again." [J.A. 7521.]

Cunningham was formally sentenced to death on June 26, 2002. [J.A. 7522.] Two weeks later, jury selection in Jackson's case began. The jury pool was aware of the extensive media coverage of the murders and Cunningham's trial and conviction. Our examination of individual questioning in the *voir dire* indicates that of the twelve jurors actually seated, all but one reported knowing about the case through the media, and the one who said he did not apparently knew one of the victims personally. [J.A. 11843-44.] Some seated jurors reported hearing it generally and others remembered specifics such as that a young child was involved. [*See*, *e.g.*, J.A. 11886.]

### B. Procedural History and Standard of Review

Prior to his trial's commencement, Jackson filed a motion for change of venue, contending that the detailed and inflammatory media coverage required the court to presume prejudice in advance of *voir dire*. He asked to move the trial away from Allen County, where the town of Lima is located. [J.A. 857-63.] The prosecution, for its part, sought to prevent any questioning during individual *voir dire* concerning the contents of pretrial publicity encountered by potential jurors and moved in limine specifically to foreclose any inquiry as to potential jurors' knowledge of the facts or outcome of Cunningham's trial. The trial court granted the state's motion and precluded all inquiry into the contents of pretrial publicity [J.A. 1684-85, 11437-41], but it withheld a ruling on Jackson's venue motion until the conclusion of *voir dire*. After *voir dire* and with the jury seated, the trial court denied Jackson's venue motion, finding that the "impartiality of the members of the jury selected and seated was not compromised by any pretrial publicity." [J.A. 1693.]

Following his conviction and death sentence, Jackson renewed his venue claim in his brief on direct appeal before the Supreme Court of Ohio. Under his Proposition

of Law I — framed, at a somewhat high level of generality, as an argument that Jackson "was entitled to a trial by a fair and impartial jury free from bias or preconceived opinions about guilt or punishment" under various state and federal constitutional provisions — his brief argued specifically: "Jackson was entitled to a change of venue. Changes in venue help to protect fair trial rights. A trial court can change venue when it appears that a fair and impartial trial cannot be held in that court." [J.A. 1937 (internal quotation marks and citations omitted).] Jackson's brief then went on to cite *State v. Lundgren*, a Supreme Court of Ohio case interpreting the federal constitutional standard for a defendant's right to a change of venue where prejudice should be presumed. *See* 653 N.E.2d 304, 313-14 (Ohio 1995) (citing, in the portion of the opinion cited in Jackson's brief, *Sheppard v. Maxwell*, 384 U.S. 333 (1966), and *Rideau v. Louisiana*, 373 U.S. 723 (1963)). Despite having this argument before it, the Supreme Court of Ohio failed entirely to address the legal question of whether Jackson was entitled to a change of venue. The word "venue" appears once in the court's opinion, in a factual statement recounting the trial court's denial of Jackson's motion. *See Jackson*, 836 N.E.2d at 1186. Overlooking the unmistakable presence of a discrete legal argument in Jackson's brief contending that he was entitled to a change of venue, the Ohio court construed his argument as challenging only the manner in which *voir dire* was undertaken, and never reached the distinct question of venue.

This procedural landscape has a significant effect on our standard of review of Jackson's venue claim, which he has renewed before this court in his habeas appeal. AEDPA ordinarily limits our grant of habeas relief to cases where the state court has acted "contrary to" or has "unreasonabl[y] appli[ed] . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). But that stricture is limited to claims that were "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). In cases such as this, "when a claim has not been adjudicated on the merits in State court proceedings, and has not been procedurally defaulted, we look at the claim de novo rather than through the deferential lens of AEDPA." *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005) (internal quotation marks and citations omitted).

The State has advised us in a supplemental brief on October 11, 2011, that this venue issue is not properly before us for decision because it "was not raised in the habeas petition," "was not reviewed by the District Court," and "Jackson never sought nor received a COA on this claim." We have gone back over the record and find that the record does not support these statements and that counsel for the State is in error that we "lack jurisdiction to grant relief on this claim." The record demonstrates that Grounds II, III and VII of the habeas petition describe due process claims going to the strict limitations placed on Jackson's counsel in questioning the jurors regarding their exposure to the extensive pretrial publicity that prompted his request for a change of venue. Item 3 of the Certificate of Appealability lists as an issue the fact that the trial court limited Jackson's ability to uncover juror bias against him and denied his motion for a change of venue. The district court denied the claim on the merits by citing Supreme Court cases, particularly stating that in "*Mu'Min*, 500 U.S. at 422, the Court determined that, while a trial court may question potential jurors about their exposure to pre-trial publicity, the court need not inquire about what media coverage each had viewed." *Jackson*, 2008 WL 1946790, at *41 (internal citations omitted). We do not lack jurisdiction to review the issue.

## C.  Merits of the Venue/*Voir Dire* Issue

Early in the 1960's the Supreme Court recognized that some instances of pervasive pretrial publicity may render the defendant's trial fundamentally unfair regardless of professions of impartiality on the part of jurors seated during *voir dire*. In *Rideau*, a case where the defendant's televised confession was broadcast to the community shortly before his trial, the Court held that "it was a denial of due process of law to refuse the [defendant's] request for a change of venue." 373 U.S. at 726 (1962). In *Estes v. Texas*, the Court again reversed a conviction where "there had been a bombardment of the community with the sights and sounds," 381 U.S. 532, 538 (1965), of media coverage of an initial pretrial hearing involving the defendant. The Court noted that a showing of actual prejudice "is not a prerequisite to reversal" where "the circumstances [are] held to be inherently suspect." *Id*. at 542, 544. And in *Sheppard*,

faced with what it called a "carnival atmosphere" wrought by extensive media coverage both before and throughout the trial, the Court held that "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." 384 U.S. at 363. The Court held that "appellate tribunals have the duty to make an independent evaluation of the circumstances," and not defer to the state trial court. *Id*. at 362. The Court said: "Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused." *Id*.

This presumption of prejudice based on pervasive publicity continued into the 1980's. In *Patton v. Yount*, 467 U.S. 1025, 1031 (1984), the Court acknowledged a presumption of prejudice: the "jurors' claims that they can be impartial should not be believed." These views concerning pretrial publicity and *voir dire* arose from a concern that human nature is such that a juror may want to conceal his own bias or may not be aware of it.

In *Mu'Min*, 500 U.S. at 433, and *Skilling*, 130 S. Ct. at 2918 (2010), the Court replaced the presumption of prejudice based on pervasive publicity and the need for extensive *voir dire* in such circumstances with a constitutional rule of deference to the trial judge with regard to *voir dire* and change of venue. *Mu'Min*, a death penalty case decided 5-4 on this issue, rejected as a constitutional standard the Standards for Criminal Justice of the American Bar Association § 8-3.5 (2d ed. 1980), which called for interrogation of each juror concerning "what the prospective juror has read and heard about the case." 500 U.S. at 430 (internal quotation marks omitted). Rather, the Court "stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias." *Id*. at 427. The trial court in *Mu'Min* had conducted the *voir dire* with four prospective jurors in each group and did not allow counsel to ask about the "content" of the publicity

a juror had heard or read about the case. The Supreme Court specifically approved this procedure.

The state trial judge in the instant case closely followed the language of the *Mu'Min* case and conducted the *voir dire* based on it. Although all of the jurors knew something about the case, the trial judge did not allow questions about the "content" of what they knew or the source of their knowledge. All of the jurors who were accepted on the jury by the trial court did state, however, that they could render a fair and unbiased verdict without regard to their knowledge of the case arising from the extensive pretrial publicity. The Supreme Court of Ohio recognized that the trial judge had conducted the *voir dire* in accordance with the pattern approved in the *Mu'Min* case. *Jackson*, 836 N.E.2d at 1186-87.

In *Skilling*, a 2010 case, the Supreme Court revisited and reaffirmed *Mu'Min* in a 5-4 opinion. *See* 130 S. Ct. at 2918, 2923. The Court had before it massive, intense, persistent pretrial publicity in Houston, Texas, about the Enron scandal and the culpability of Enron's officials. The defendant was the chief operating officer who became the chief executive of Enron. In denying a change of venue, the Court repeatedly cited and quoted *Mu'Min* with approval:

> Jury selection, we have repeatedly emphasized, is "particularly within the province of the trial judge." . . . *see*, *e.g.*, *Mu'Min*, 500 U.S. at 424.
>
> . . . .
>
> When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror." *Mu'Min*, 500 U.S. at 427. Appellate courts making after-the-fact assessments of the media's impact on jurors should be mindful that their judgments lack the on-the-spot comprehension of the situation possessed by trial judges.
>
> . . . .
>
> In reviewing claims of this type, the deference due to district courts is at its pinnacle: "A trial court's findings of juror impartiality may be

overturned only for manifest error." *Mu'Min*, 500 U.S. at 428 (internal citations and quotation marks omitted).

*Id*. at 2917-18, 2923.

Based on *Skilling*, there seems to be no doubt that the *Mu'Min* constitutional standard represents the current Supreme Court law of due process that must be applied by lower courts to problems related to change of venue and the questioning of jurors. The older standards articulated in the 1960's and repeated in the 1984 *Patton v. Yount* case no longer represent the current state of the law, and we are constrained to apply the new standards of *Mu'Min*. That standard and our uncertainty as to the scope and content of the jurors' knowledge leads us to defer to the state trial judge's rejection of a change of venue from the small town where the case was tried to another county of the state. Absent more detailed knowledge of what the jurors knew from the press, we are unable to say what effect the publicity had.        *Mu'Min*'s deferential *voir dire* rule eliminates the factual basis for an appellate finding of "manifest error" by the trial judge.

### III.  Jackson's Other *Voir Dire* Claims

**1. Whether the Trial Court Improperly Prohibited Trial Counsel From Examining Prospective Jurors About Potential Bias Against Someone Accused of Killing a Young Child**

Jackson claims that the trial court unduly restricted *voir dire* when it refused to allow inquiry by defense counsel of prospective jurors concerning their views about imposing the death penalty on a person who is convicted of killing a three-year-old child. Counsel wanted to discover bias or a tendency toward automatic imposition of the death penalty for this class of defendants. The Warden concedes that this claim is properly preserved. As noted above, the Supreme Court of Ohio accepted this claim and ruled that the trial court abused its discretion in this respect. Jackson's argument on appeal primarily pertains to that court's remedy: the Ohio court vacated only the death sentence imposed for the murder of Jayla Grant, the three-year-old child, but Jackson contends that his improper death sentence (or even his conviction) for the other murder, of Leneisha Williams, should have been vacated as well. Jackson contends that the child

murder washes over the whole case.  The constraint of AEDPA precludes our issuing the writ on this basis.

The Ohio Supreme Court's description of the relevant facts, its reasoning, and its disposition of the issue, are excerpted in part below:

> During individual voir dire, after six prospective jurors had been questioned, including four who eventually were seated as jurors, defense counsel requested that the trial court inform prospective jurors that one murder victim was three years old and allow the defense to question prospective jurors about that fact to reveal any bias toward imposing the death penalty. At the time this issue was raised, the trial court had not informed the venire that one murder victim was three years old. Nor did the court inform any of the remaining prospective jurors of this fact.
>
> The trial court rejected defense counsel's request and would not permit counsel to discuss the ages of the murder victims with the venire. [. . .]
>
> After another 15 prospective jurors had been individually questioned, including three who eventually became jurors, defense counsel again asked to examine prospective jurors about their views on imposing the death penalty on child murderers.
>
> The trial court denied defense counsel's second request, ruling that a defendant is not entitled to question prospective jurors on the specifics of the case. [. . .]
>
> We conclude that the trial court's limitation on voir dire in this case was an abuse of discretion. The trial court erred when it held that appellant was not entitled to have prospective jurors informed that one of the murder victims was three years old. While fairness requires that jurors be impartial, prospective jurors need not be totally ignorant of the facts and issues involved to be qualified as jurors. *State v. Gross*, 97 Ohio St. 3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 38, citing *State v. Sheppard (*1998), 84 Ohio St. 3d 230, 235, 703 N.E.2d 286; *Murphy v. Florida* (1975), 421 U.S. 794, 799-800, 95 S. Ct. 2031, 44 L. Ed. 2d 589. [. . .]
>
> In this case, the trial judge misconstrued defense counsel's request to inform the prospective jurors of Jayla's age as an attempt "'to predispose jurors to react a certain way to anticipated evidence,'" quoting *Missouri v. Clark*, 981 S.W.2d 143, 147. Counsel were merely attempting to discover whether prospective jurors could fairly consider imposition of a life sentence in a case involving a three-year-old murder victim. While it is improper for counsel to seek a commitment from prospective jurors on whether they would find specific evidence mitigating, *State v. Bedford,* 39 Ohio St. 3d at 129, 529 N.E.2d 913, counsel should be permitted to present uncontested facts to the venire

directed at revealing prospective jurors' biases. *Turner v. Murray* (1986), 476 U.S. 28, 36-37, 106 S. Ct. 1683, 90 L. Ed. 2d 27.

[. . .]

"The Constitution . . . does not dictate a catechism for voir dire, but only that the defendant be afforded a fair and impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S. Ct. 2222, 119 L. Ed. 2d 492; *State v. Wilson*, 74 Ohio St. 3d at 386, 659 N.E.2d 292. "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States* (1981), 451 U.S. 182, 188, 101 S. Ct. 1629, 68 L. Ed. 2d 22. Accordingly, the exercise of the trial court's discretion to restrict inquiry by counsel is subject to the essential demands of fairness. *Morgan*, 504 U.S. at 730, 112 S. Ct. 2222, 119 L. Ed. 2d 492, citing *Aldridge v. United States* (1931), 283 U.S. 308, 310, 51 S. Ct. 470, 75 L. Ed. 1054.

Questions on voir dire must be sufficient to identify prospective jurors who hold views that would prevent or substantially impair them from performing the duties required of jurors. *Morgan*, 504 U.S. at 734-735, 112 S. Ct. 2222, 119 L. Ed. 2d 492. Moreover, the fact that defendant bears the burden of establishing juror partiality, see *Wainwright v. Witt*, 469 U.S. at 423, 105 S.Ct. 844, 83 L. Ed. 2d 841, makes it all the more imperative that a defendant be entitled to meaningful examination at voir dire in order to elicit potential biases held by prospective jurors. *Mu'Min v. Virginia*, 500 U.S. at 441, 111 S. Ct. 1899, 114 L. Ed. 2d 493 (Marshall, J., dissenting).

The trial court here was on notice that some prospective jurors harbored a strong bias in favor of imposing death for murderers of children. If an issue of bias surfaces before trial, it is the trial court's responsibility to conduct an adequate inquiry. *Oswald v. Bertrand* (C.A.7, 2004), 374 F.3d 475, 484. See, also, *United States v. Barber* (C.A.4, 1996), 80 F.3d 964, 968 (an inquiry is required during voir dire to eliminate prejudice that threatens the fairness of the process or the result). The greater the probability of bias, "the more searching the inquiry needed to make reasonably sure that an unbiased jury is impaneled." *Oswald v. Bertrand*, 374 F.3d at 480.

At a minimum, the trial court should have granted defense counsel's request to inform the venire that one murder victim was a three-year-old child. If the prospective jurors had been aware of this fact when they were asked general questions of fairness and impartiality, they may well have been prompted to admit to a predisposition to recommend the death penalty for those who murder children. However, without knowledge of this fact, prospective jurors could respond truthfully to

general questions of fairness and impartiality while the specific concern was left unprobed.

In this case, appellant was charged with killing a three-year-old child. "[I]t is in just these circumstances, when the crime itself is likely to inflame the passions of jurors, that courts must be vigilant in ensuring that the demands of due process are met." *McKenzie v. Smith* (C.A.6, 2003), 326 F.3d 721, 727-728 (case involving brutal assault on three-year-old child). Protecting children from harm is a common human characteristic, and many people harbor strong feelings and emotions whenever a child is a victim of a violent crime. Some prospective jurors, when presented with this fact, may have been unable to remain dispassionate and impartial when deciding whether the death sentence should be imposed. The possibility that one juror might not have fairly considered sentencing options and may have voted for the death penalty solely because appellant murdered a three-year-old child is a risk too great to ignore. "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan*, 504 U.S. at 729, 112 S. Ct. 2222, 119 L. Ed. 2d 492. Therefore, we find that due process required that defense counsel be allowed to determine whether any members of the venire harbored prejudices regarding this fact in order to exercise their challenges intelligently.

We hold that in a death-penalty case involving the murder of a young child the defendant is entitled, upon request, to have the prospective jurors informed of that fact and to ask questions that seek to reveal bias. The trial court retains its discretion as to the form and number of questions on the subject, including whether to question the prospective jurors individually or collectively. See *State v. Wilson*, 74 Ohio St. 3d at 386, 659 N.E.2d 292; *Ham v. South Carolina*, 409 U.S. at 527, 93 S. Ct. 848, 35 L. Ed. 2d 46.

The trial court abused its discretion by refusing defense counsel's requests to advise prospective jurors that one of the murdered victims was a three-year-old child and by refusing to allow voir dire on that fact. Therefore, the death sentence imposed on appellant in Count I for the aggravated murder of Jayla Grant is vacated. The matter is remanded to the trial court for resentencing consistent with R.C. 2929.06. *Our disposition of this issue does not affect the separate death sentence imposed on Jackson for the death of Leneshia Williams.* (Emphasis added.)

*Jackson*, 836 N.E.2d at 1189-92. Now in this habeas appeal, it is the final sentence of the above-quoted excerpt with which Jackson takes issue: he maintains — as he must for this case to qualify for habeas relief under 28 U.S.C. § 2254(d)(1) — that the Ohio Supreme Court either acted contrary to or unreasonably applied clearly established Supreme Court precedent in vacating only one, but not the other, of Jackson's two death

sentences, where defense counsel was forbidden to inquire about bias on the part of potential jurors against accused child killers.

We do not agree for the simple reason that there was no "clearly established law" governing this issue for the Ohio court to contravene or unreasonably apply in disposing of Jackson's claim. We are limited in determining what counts as clearly established law to the "holdings," as opposed to the dicta, of Supreme Court cases in effect at the time of the state court's decision. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). The holdings of the Supreme Court governing questions a defendant's counsel is constitutionally entitled to ask of potentially biased jurors are narrow, as our previous discussion indicates, and cluster primarily around the topic of racial bias. Jackson appears in his brief on appeal principally to rely on *Turner v. Murray* as the case the Ohio court unreasonably applied, but the holding of that case is explicitly limited to race. *See* 476 U.S. 28, 36-37 (1986) ("We hold that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias."). Other cases cited by Jackson similarly fall short of establishing whether the Ohio Supreme Court violated clearly established constitutional law when it vacated one, but not both, of Jackson's death sentences. In *Ham v. South Carolina*, the Supreme Court reversed a conviction where a trial court "refus[ed] to make any inquiry as to racial bias of the prospective jurors," but conspicuously rejected — over a vigorous dissent — an argument contending that it was error not to allow defense counsel to question the jury pool about non-racial bias, which in that case consisted of a bias against "men with beards." 409 U.S. 524, 527-28 (1973); *see also id.* at 531-34 (Marshall, J., concurring in part and dissenting in part). Notably, even in the sphere of racial bias, the Supreme Court has retreated from a conception of *Ham* as a "per se" or "universal[ly] applicab[le]" rule entitling counsel to ask certain questions during *voir dire*. *Ristiano v. Ross*, 424 U.S. 589, 596 & n.8 (1976).

This is not to endorse the reasoning of the Supreme Court of Ohio as legally correct. *See Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (distinguishing AEDPA-reasonableness from legal correctness). In *Greene*, the Supreme Court has told us we

may not engage in "error correction." 132 S. Ct. at 143. Indeed, the Supreme Court of Ohio's analysis leading to its vacating of the death sentence related to the Jayla Grant murder may be persuasive as an extension of constitutional principles. Nevertheless, the Ohio court's holding on the murder of Leneisha Williams does not violate clearly established Supreme Court precedent. The two murders were tried together to the same jury, and one of the death penalty specifications — a so-called "mass murder" specification applying to defendants who killed or attempted to kill two or more people — could very plausibly be thought explicitly to invite, if not require, jurors to consider the two murders together when making their sentencing determination. Why the Supreme Court of Ohio concluded that bias against child killers may have infected one but not the other of these two simultaneously imposed death sentences is not stated. But the Supreme Court has declared that even this form of summary adjudication merits so-called AEDPA deference. *Richter*, 131 S. Ct. at 784-85 (stating that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits," even where the state court fails to give reasons supporting its conclusions). Likewise, here we do not believe that the failure of the Ohio court to explain its reasoning meets the AEDPA standard of an "extreme malfunction[] in the state criminal justice system[]," *Greene*, 132 S. Ct. at 43 (internal citations and quotation marks omitted). Such failures appear with some frequency in our legal system in courts from the lowest to the highest.

In sum, we hold only that there was no clearly established law governing the issue of what questions defense counsel is entitled to ask in order to examine jurors concerning non-racial bias against defendants accused of murdering a child. On that basis alone, against the backdrop of AEDPA as interpreted by the Supreme Court, we must deny Jackson's claim.

## 2.  Retention of Pro-Death-Penalty Jurors And Exclusion of Anti-Death-Penalty Jurors

Jackson next argues that the trial court failed to excuse jurors in an even-handed way when it allowed jurors who have a preference for the death penalty in murder cases

to remain while at the same time excusing jurors who dislike the death penalty or have reservations about imposing the death penalty. The constitutional problem of whether to allow states to exclude jurors who have qualms about the death penalty begins with *Witherspoon v. Illinois*, 391 U.S. 510 (1968). In an opinion by Justice Stewart, the Court said that the jury in a capital case "can do little more — and must do nothing less — than express the conscience of the community on the ultimate question of life or death," *id.* at 519, and the state may not "cull[]" from the jury "all who harbor doubts about the wisdom of capital punishment — of all who would be reluctant to pronounce the extreme penalty," *id.* at 520. The Court made it clear that a state may exclude jurors who are "automatically . . . against" *id.* at 522 n.21, the death penalty but not those who harbor doubt or "would be reluctant to pronounce the extreme penalty," *id.* at 520. *Witherspoon* is no longer the law. In 1985, Justice Rehnquist wrote an opinion for the Court — like his opinion in *Mu'Min* — that holds that "deference must be paid to the trial judge who sees and hears the juror" and must include "a presumption of correctness" under 28 U.S.C. § 2254, a presumption that is now strengthened by AEDPA deference. *Wainwright v. Witt*, 469 U.S. 412, 426 (1985). Here, Ohio's highest court upheld the trial judge's rulings on the acceptance or rejection of jurors. The U.S. Supreme Court has now made it completely clear that the interest of the state in imposing the death penalty must be honored under AEDPA by deferring to the state court concerning the exclusion of jurors who are reluctant to impose the death penalty. *See Uttecht v. Brown*, 551 U.S. 1 (2007). Scholars now argue that this new deference to the state's interest in imposing the death penalty has tilted the scales heavily in favor of a system that prefers jurors who favor the death penalty, instead of those who are reluctant to impose it. *See*, *e.g.*, G. Ben Cohen, "The Death of Death-Qualification," 59 CASE W. RES. L. REV. 87 (2008); Adam M. Clark, "An Investigation of Death Qualification As A Violation of the Rights of Jurors," 24 BUFF. PUB. INT. L.J. 1 (2006).

Jackson's challenge focuses on four jurors questioned during *voir dire*, none of whom were excused for cause. Concerning Juror No. 230, Jackson focuses his argument on a single exchange between defense counsel and this juror during *voir dire*, where the juror answered "I think so" when asked if there were circumstances in which he would

"automatically" impose the death penalty. [J.A. 11743.] However, at multiple other times during this juror's examination — including directly after this response — the juror indicated a willingness to follow the judge's instructions, and that he did not think the death penalty was "right for every case." [J.A. 11721-22, 11745.] Jackson maintains that Juror No. 291 would only return a verdict other than death if the defendant proved it was done in self-defense, but the record demonstrates that she in fact acknowledged other circumstances in which she might not impose the death penalty [J.A. 12230], and in any case consistently denied that she would automatically impose the death penalty in every case [J.A. 12228-29]. Jackson makes a similar allegation as to Juror No. 299, and, while the record at times provides more support than it does for No. 291 [J.A. 12277-78], No. 299 at other times expressed a willingness to weigh mitigating evidence consistent with the court's instructions and denied that she would automatically impose the death penalty upon conviction [J.A. 12289-90]. In light of the record, the Ohio court's determination that these responses satisfied *Witt* was not unreasonable. Finally, Jackson complains that the trial court did not excuse for cause Juror No. 263. The Ohio Supreme Court found that he waived this objection by not raising it during *voir dire* itself, where trial counsel explicitly passed the juror for cause. *Jackson*, 836 N.E.2d at 1188; [J.A. 12047]. Even were we to overlook the procedural implications of defense counsel's failure to challenge this juror for cause (which are unraised by the Warden in this appeal), our review of the record suggests that this juror's responses during *voir dire* complied with the dictates of *Witt* as he expressed an ability to consider fairly all sentencing options. [*See* J.A. 12042.]

Jackson also contests the trial court's refusal to allow him to rehabilitate anti-death-penalty jurors excused for cause as unqualified to sit on a capital jury during *voir dire*. This core claim was rejected by the Supreme Court of Ohio on direct appeal, *Jackson*, 836 N.E.2d at 1187, and the district court sitting in habeas, *Jackson*, 2008 WL 1946790, at *45.

Jackson identifies four jurors who were excused for cause as biased against the death penalty without his having a chance to rehabilitate them. Juror No. 222 during

initial questioning by the trial court repeatedly and clearly indicated that he would be unable to follow the court's instructions in considering the penalty of death, and was then excused for cause. [J.A. 11632.] Juror No. 228 during questioning by the trial court unequivocally stated his opposition to the death penalty and his inability to follow the court's instructions, and — after a sidebar in which the trial court agreed to defense counsel's request for a further line of inquiry — was excused. [J.A. 11671-76.] Juror No. 300 also repeatedly indicated an unwillingness to follow the court's instructions in considering the death penalty. [J.A. 12297-99.] In light of the limited scope of our review in this habeas appeal, as explained above, we cannot say the Ohio Supreme Court's resolution of Jackson's claims as to these jurors was unreasonable.

Juror No. 301, out of all jurors Jackson identifies, was perhaps most equivocal in her responses. Under initial questioning by the trial court, she first indicated that she would have no choice and would be "required" to consider the death penalty [J.A. 12316]; she then responded that she "d[id]n't know" whether she could or not, but that she "would try" [*id.*]. Later, under questioning by the prosecution, she indicated she "would fairly consider" the death penalty despite her scruples about it. [J.A. 12324.] Under further questioning, she then answered that she could not give the death penalty "equal weight" compared to other sentences, and then said, "I would try my best to consider it, but already I know in my head that there is that bias there that if I were given a choice I would not treat the death penalty as much as an option." [J.A. 12328-29.] The trial court then granted the prosecution's challenge for cause, and refused defense counsel's request to attempt to rehabilitate her. We agree with the Ohio Supreme Court's precatory observation that it would "have been preferable for the trial court to permit defense counsel to question th[is] juror[]." *Jackson*, 836 N.E.2d at 1187. But, again, under the limited scope of our review, we cannot grant habeas relief on Jackson's claim. We are not permitted to return to the 1968 *Witherspoon* relaxed standard that allows all but death penalty abolitionists to serve.

**IV. Ineffective Assistance Claims**

**1. Whether Trial Counsel Rendered Ineffective Assistance Throughout Trial**

As the basis for his claim that his trial counsel was constitutionally ineffective — conceded to be preserved by the Warden — Jackson cites various incidents from the guilt phase of the trial: (1) counsel's alleged failure to demonstrate the need for adequate investigative and expert assistance; (2) counsel's alleged failure to investigate and prepare evidence in support of a motion to suppress; (3) counsel's alleged ineffectiveness during *voir dire*; (4) counsel's alleged failure to provide any guidance during opening statements; (5) counsel's alleged failure to object to inflammatory portions of the prosecution's opening statement; (6) counsel's alleged failure to cross-examine effectively Jackson's half-sister, Tara Cunningham; and (7) counsel's alleged failure to cross-examine effectively forensic pathologist Dr. Cynthia Beisser. Jackson's guilt-phase ineffective assistance claim was rejected by both the Supreme Court of Ohio on direct review, *Jackson*, 836 N.E.2d at 1204-06, and the district court in denying Jackson's habeas petition, *Jackson*, 2008 WL 1946790, at \*57-62.

Claims of ineffective assistance of counsel are analyzed under the well established two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail on this claim, Jackson must demonstrate first that his counsel's performance was deficient — that is, that counsel's performance fell below an objective level of reasonable representation — and then that the deficient performance prejudiced his right to a fair trial, meaning a trial the outcome of which is reliable and worthy of confidence. *Id.* at 687-88, 694. The Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA; it requires the petitioner not only to demonstrate the merit of his underlying *Strickland* claim, but also to demonstrate that "there is no possibility fairminded jurists could disagree that the state court's decision [rejecting the *Strickland* claim] conflicts with this Court's precedents." *Richter*, 131 S. Ct. at 786 (noting that this was "meant to be" a difficult standard to meet). Considering that *Strickland*'s own standard invites deference to the conduct of counsel, *Strickland*, 466 U.S. at 689, combining that standard

with AEDPA creates a "doubly" deferential standard, *Richter*, 131 S. Ct. at 788 (also noting that "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial"). In the end, our significantly constrained review of this claim boils down to the determination of whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Briefly addressing this question in the context of each of his sub-claims below, we conclude that the Supreme Court of Ohio did not unreasonably apply *Strickland* in disposing of Jackson's ineffective assistance claim, nor create an "extreme malfunction[] in the state criminal justice system[]." *Greene*, 132 S. Ct. at 43.

Jackson's first sub-claim contends that trial counsel failed to demonstrate the need for expert assistance reasonably necessary to assist in his defense. However, the Supreme Court of Ohio found and our examination of the record confirms that trial counsel did successfully request both a clinical psychologist (specifically in preparation for a potential mitigation phase) and a ballistics expert. *Jackson*, 836 N.E.2d at 1204. Accordingly, the Ohio court's rejection of this sub-claim was not unreasonable.

Jackson's second sub-claim argues that trial counsel failed effectively to investigate, prepare, and litigate a motion to suppress potentially incriminating statements made by Jackson to the police. The Supreme Court of Ohio found that this claim must fail because Jackson could not have suffered *Strickland* prejudice, as the statements in question were never introduced at trial. *Id.* Jackson in his brief on appeal does not appear to contest this proposition and fails to cite anything to contradict it from the record, and accordingly we find that the Ohio court acted reasonably in disposing of this claim.

Jackson's third sub-claim alleges that his trial counsel engaged in deficient performance during *voir dire*. Apart from largely repeating arguments — described above — complaining of the trial court's limitations on *voir dire*, he suggests that trial counsel was ineffective in not zealously contesting the trial court's limitation and in not questioning jurors in more detail concerning their possible bias in favor of the death penalty or racial bias. On the contrary, our review of the record indicates that counsel

made numerous motions and objections throughout *voir dire* vigorously contesting the district court's *voir dire* limitations and otherwise conducted as able and thorough a *voir dire* as was possible under the circumstances. Accordingly, the Ohio court's rejection of this sub-claim was not unreasonable.

In his fourth sub-claim, Jackson complains of his counsel's alleged failure to provide the jury with guidance during his opening statement. This claim was put before the Ohio courts, which did not address it. Accordingly, we may review it de novo. *Thompson v. Bell*, 580 F.3d 423, 439 (6th Cir. 2009). Nonetheless, this sub-claim does not merit *Strickland* relief. As the district court noted in disposing of this claim, we have previously held that the decision to forgo an opening statement entirely "is ordinarily a mere matter of trial tactics and . . . will not constitute . . . a claim of ineffective assistance of counsel." *Millender v. Adams*, 376 F.3d 520, 525 (6th Cir. 2004) (internal citations and quotation marks omitted). Here, defense counsel did make an opening statement, which, although relatively brief, coherently presented a theory of the case in which Cunningham was the primary shooter and had a different "agenda" than Jackson. [J.A. 12646-49.] We find that counsel's opening statement was not deficient performance.

Fifth, Jackson contends that his counsel was ineffective for not objecting to allegedly inflammatory portions of the prosecution's opening statement. The Supreme Court of Ohio rejected this sub-claim by finding that the allegedly improper statements were not sufficiently prejudicial to Jackson to merit relief. *Jackson*, 836 N.E.2d at 1206. We specifically denied Jackson's motion for a certificate of appealability as to his allegations of prosecutorial misconduct, and so, having already found that the underlying claim of prosecutorial misconduct was not "adequate to deserve encouragement to proceed further," *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (internal citations and quotation marks omitted), we cannot find that defense counsel's failure to object to it constituted ineffective assistance.

Sixth, Jackson complains of defense counsel's alleged failure properly to cross-examine Tara Cunningham, Jackson's half-sister and a witness for the prosecution, who

testified that she witnessed Jackson's and Jeronique Cunningham's discussion of their plan to rob Shane Liles and that, after the shootings, she heard Jackson say that he "didn't mean to shoot that baby." [J.A. 12800-02.]  His core contention in support of this sub-claim is that trial counsel failed to discover or properly cross-examine Tara Cunningham concerning an alleged deal struck between her and the prosecution in exchange for her testimony.  The Supreme Court of Ohio rejected this argument, reasoning that "[t]here is no evidence in the record that the state offered anything to Tara for her testimony."  *Jackson*, 836 N.E.2d at 1205.  We agree with the Ohio court's evaluation of the record, and further note that defense counsel did effectively cross-examine Tara Cunningham:  trial counsel elicited that she feared losing her public housing, [J.A. 12812], and that she smoked marijuana on the morning of the murders, [J.A. 12813-14], and, further, confronted her with her prior testimony in the trial of Jeronique Cunningham, her other half-brother, where she conspicuously did not mention hearing Jackson's post-shooting comment about not "mean[ing] to shoot that baby." [J.A. 12806.]  In light of the record, we cannot grant *Strickland* relief as to this sub-claim.

Finally, Jackson contends that defense counsel failed to cross-examine effectively forensic pathologist Dr. Cynthia Beisser, who testified for the prosecution about the gunshot injuries suffered by the victims.  In this sub-claim, he argues that counsel's failure to interview Dr. Beisser before attempting to cross-examine her prejudiced Jackson's case; he specifically directs our attention to an exchange where Dr. Beisser refused to agree to a hypothetical question concerning possible bullet trajectories, intended to bolster the defense's argument that Cunningham, not Jackson, shot the bullet that killed Jayla Grant. [J.A. 13116-13120.]  Jackson argues that, had defense counsel interviewed Dr. Beisser before cross-examining her, this allegedly damaging exchange could have been avoided.  Alternatively, he argues that defense counsel should have called his own ballistics expert to refute Dr. Beisser's testimony concerning the path of the bullets fired.  The Supreme Court of Ohio resolved this sub-claim by finding no prejudice; it concluded that, because Ohio law did not require Jackson to be the shooter in any case, and because substantial other evidence linked

Jackson to the murders, no prejudice could have flowed from counsel's failure to interview Dr. Beisser before cross-examining her. *Jackson*, 836 N.E.2d at 1205. The court further noted that Jackson's counsel had prevailed on a motion for funds to hire a ballistics expert, but, in an apparent strategic decision, never called one to the stand. *Id.* at 1205 n.1. Especially in light of the substantial evidence linking Jackson, and his automatic handgun, to the shootings, we cannot find the Ohio court's rejection of this sub-claim unreasonable.

**2. Whether Trial Counsel Rendered Ineffective Assistance of Counsel by Failing to Investigate and Introduce Helpful and Explanatory Mitigating Evidence at Trial**

Finally, Jackson argues that he was deprived of his right to effective assistance of counsel during the penalty phase of the trial. Claims of ineffective assistance of counsel as to the penalty phase of a capital proceeding are analyzed under the same two-part *Strickland* standard described above, and in the context of capital sentencing, the Supreme Court has made clear that counsel's Sixth Amendment responsibilities include a duty to engage in a reasonable investigation concerning aspects of the defendant's background that would support a mitigation case. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). This claim was rejected by both the Supreme Court of Ohio on direct review, *Jackson*, 836 N.E.2d at 1206, and the district court sitting in habeas, *Jackson*, 2008 WL 1946790, at *62-66.

Jackson's argument in support of this claim appears to focus primarily on three alleged failures of counsel. He claims (1) that counsel failed to investigate thoroughly and effectively present evidence concerning Jackson's traumatic childhood and his violent and abusive mother; (2) that counsel failed to investigate thoroughly and effectively present Jackson's juvenile history, specifically a psychological evaluation conducted after a juvenile conviction; and (3) that counsel failed to request or demonstrate the need for a cultural expert to explain to the jury the effects of Jackson's heritage and upbringing on his behavior as a young adult. We will address each of these sub-claims in turn.

Jackson's first claim, alleging an ineffective investigation and presentation of his starkly troubled childhood, is belied by the trial record. During the penalty phase, defense counsel introduced first-hand accounts of Jackson's childhood by calling to the stand two of his aunts, and his mother. As an initial matter, all three witnesses testified that Jackson's mother stabbed Jackson's abusive father to death in front of Jackson, when he was three or four years old. [J.A. 13437, 13445-46, 13454-55.] The first aunt, Joyce McNeal, testified that Jackson's mother drank, that there was "a lot of physical abuse" in Jackson's childhood home, and that his mother attempted suicide multiple times. [J.A. 13437-40.] The second aunt, Denise Cage, confirmed these details, and further recalled hearing that Jackson had been raped in a foster home during a period in which he had been removed from his mother's care. [J.A. 13448.] Finally, Jackson's own mother, Betty Cunningham, confirmed her drug problems and suicide attempts, and that Jackson had been taken from her by Children's Services. [J.A. 13452-13460.] Against this record, Jackson in this appeal nonetheless maintains that "[c]ounsel did not present testimony demonstrating that . . . Cunningham had sub-standard parenting skills and Children's Services had to assist her in raising her children." [Br. for Pet'r.-Appellant 58.] We do not agree. Jackson also argues that counsel was ineffective for not introducing records from Children's Services concerning his history, but the Supreme Court has expressly found no *Strickland* prejudice in cases where similar unintroduced records "basically substantiate the testimony of [relatives]." *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1409-10 (2011).

Next, Jackson argues that counsel was ineffective for not discussing a psychological evaluation made after Jackson's juvenile arrest and conviction for gross sexual imposition. A review of the record strongly suggests that the failure to introduce materials related to Jackson's juvenile criminal history was a strategic decision made by counsel to avoid bringing up his conviction for gross sexual imposition; as the Warden notes in his brief, Jackson's counsel explicitly and successfully requested that the prosecution be forbidden from referring to his juvenile record and convictions. [J.A. 13503-04.] Strategic decisions such as this fall well outside the scope of our review. *See Strickland,* 466 U.S. at 681.

Finally, Jackson argues that counsel was ineffective for not employing a "cultural expert" to explain the effect of Jackson's upbringing on his behavior in committing the murders. Again, this claim is belied by the record: in addition to calling the three relatives discussed above, Jackson's counsel called a fourth witness in the penalty phase, Dr. Kathleen Burch, a psychologist, who discussed the effect of Jackson's childhood on his present mental state. In addition to summarizing records from Children's Services describing various troubled episodes in Jackson's childhood, Dr. Burch testified that aspects of Jackson's upbringing — in particular, his lack of a positive male role model — made him statistically more susceptible to aggressiveness and deficient moral development. [J.A. 13482-84.] She concluded that "as a consequence" of his history — which included witnessing his father's killing at the hands of his mother, being abused at the hands of both his mother and several of her boyfriends, and occasional periods without adequate food or shelter — "he developed a certain way of looking at the world which limit[ed] his choices later on." [J.A. 13502-03.] It is unclear, to say the least, what a cultural expert could have offered the jury that Dr. Burch did not provide, and so we can find no prejudice in this alleged error of counsel. The jury had before it Jackson's cultural background and the pathology behind his childhood development.

Accordingly, we reject Jackson's claim that his counsel rendered ineffective assistance during the trial's penalty phase.

In light of the foregoing analysis, we affirm the judgment of the District Court.